Filed 1/29/14  P. v. Estrada CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL VINCENT ESTRADA,<br><br>Defendant and Appellant. | B247424<br><br>(Los Angeles County<br>Super. Ct. No. TA120194) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Patrick Connolly, Judge.  Affirmed.

Linn Davis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Michael Vincent Estrada was convicted of shooting at an inhabited building in violation of Penal Code[1] section 246, shooting from a motor vehicle in violation of section 12034, subdivision (c), assault with a semiautomatic firearm in violation of section 245, subdivision (b), evading an officer in violation of Vehicle Code section 2800.2, subdivision (a), possession of a firearm by a felon, and carrying a loaded firearm as a gang member in violation of section 12031, subdivision (a)(1). The jury found true the allegations that the shootings and assault were committed for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1)(B), and that the section 246 violation was committed for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(4). The jury also found true firearm allegations pursuant to sections 12022, subdivision (a)(1) and section 12022.5, and a great bodily injury allegation pursuant to section 12022.55. The trial court found true the allegations that appellant had suffered a prior serious felony conviction within the meaning of sections 667, subdivision (b) through (i) and 1170.12 (the "Three Strikes" law) and section 667, subdivision (a), and also the allegation that appellant served a prior prison term within the meaning of section 667.5, subdivision (b). The trial court sentenced appellant to a term of 35 year to life plus four years and eight months in state prison.

Appellant appeals from the judgment of conviction, contending the trial court erred in denying his motion for reappointment of counsel, and also contending there is insufficient evidence to support the true finding on the gang enhancement. Appellant further contends the trial court erred in instructing the jury on the elements of the gang enhancement allegation. We affirm the judgment of conviction.


FACTS

On September 27, 2011, about 10:30 a.m., Sylvia Lozano heard approximately three gunshots. Patricia Torres, who lived two houses away from Lozano on Indigo

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

Street in Compton, heard five or six gunshots. Torres looked out her front window and saw a bald male who appeared to be "Latino" in front of Lozano's gate. He ran away, toward Tamarind. Lozano discovered bullet holes in a wall of her house and called 911.

Los Angeles County Sheriff's Deputy John Orozco and his partner Deputy Robles were in the vicinity, heard gunshots, and saw two vehicles travelling on Indigo at a high rate of speed. One vehicle was gold, the other green. Both ran the stop sign at the intersection, narrowly missing a collision with the deputies' car. Deputy Orozco saw that the driver of the green car was appellant and the driver of the gold car was co-defendant Venegas. Neither car had any passengers.

The deputies followed the green car, which accelerated, ran a stop sign and turned onto Tamarind. There, the car stopped and appellant threw an object out of the car. Luis Madera and Erika Contreras observed the object being thrown. Madera alerted Sheriff's Deputy Alfonso Rodriguez to the object. Deputy Rodriguez discovered that the object was a gun.

The green car turned onto Cocoa, and the deputies followed. The gold car re-appeared, driving in the opposite direction, toward the patrol car. After the gold car passed the green car, it swerved toward the patrol car. Deputy Robles also swerved, and was able to avoid a collision. The deputies continued to follow the green car as it drove through stop signs and traveled on the wrong side of the street. The green car eventually returned to Tamarind with the deputies following. There, the gold car reappeared and drove head on into the patrol car, disabling it. The deputies were able to arrest Venegas, the driver of the gold car.

Sheriff's Deputies Jeff Lohmann and Saul Saucedo came to the crash scene, then drove down Caldwell following the last known direction of the green car. The officers found the green car, a Mercury Sable, on East Caldwell. No one was inside. A bullet casing was visible on the windshield. A containment was set up around the area.

Deputies learned that appellant was located inside the home of Patsy Thomas. She had known appellant when he was younger. Appellant entered her house wearing a black hoodie sweatshirt and black shorts. After the house was surrounded, appellant

3

surrendered.  He was wearing only his underwear.  A black hoodie and black and gray shorts were found inside the house.

Martha Oviedo, who lived across the street, confirmed that she had seen appellant drive up in the green car earlier.

Sheriff's Criminalist Manuel Munoz test fired the gun recovered from Tamarind Street and compared casings from that firing with casings recovered from the sidewalk in front of Lozano's home and the windshield of the green car.  All of the recovered casings were fired from the recovered gun.  A bullet recovered from Lozano's home had the general rifling characteristics that would be produced by being fired from the Glock, but was too deformed to be matched to the Glock.

A gunshot residue ("GSR") test was performed on appellant on the day of his arrest.  Two particles in the sample collected were consistent with gunshot residue.

At trial, the prosecution presented evidence that appellant and Venegas were members of the Compton Varrio, Born Krazy Minded, 13 gang ("BKM").  Sheriff's Investigator Joseph Sumner testified as an expert on the BKM gang.  The Lozano House on Indigo Street was in territory previously claimed by the BKM gang before they were pushed out.  They were trying to reclaim the area.  Given a hypothetical based on the facts of this case, Investigator Sumner opined that the activities were done for the benefit of the BKM gang.  Gangs often used two cars during a shooting, to facilitate the success of the shooting.

Co-defendant Venegas offered the testimony of Head Deputy Alternate Public Defender Armando Wood that in his experience in the Compton courthouse, the majority of shooting cases do not involve two cars.

Appellant testified on his own behalf.  He admitted firing gunshots on Indigo Street, but claimed he was fired at first by two Hispanic men.  Appellant drove away. When he was stopped at a stop sign, Deputies Orozco and Robles pulled up next to him, got out of their car and pointed their guns at him.  Appellant was afraid and drove away in fear.  During his flight from deputies, he noticed his childhood friend Venegas driving past in a gold car.  Appellant parked his car and went into the backyard of the Thomas

4

house.  Rick Thomas, a childhood friend, invited him inside.  Appellant took off his clothes before surrendering so that police could see that he did not have a gun.

DISCUSSION

1.  Request for reappointment of counsel

Appellant contends the trial court abused its discretion in denying his request for reappointment of counsel, made on the day trial was set to begin.  He specifically contends the court considered inappropriate factors and failed to consider appropriate factors.  We see no abuse of discretion.

"When a criminal defendant who has waived his right to counsel and elected to represent himself under *Faretta v. California* (1975) 422 U.S. 806 . . .  seeks to revoke that waiver and have counsel appointed, the trial court must exercise its discretion under the totality of the circumstances, considering factors including the defendant's reasons for seeking to revoke the waiver, and the delay or disruption revocation is likely to cause the court, the jury and other parties."  (*People v. Lawrence* (2009) 46 Cal.4th 186, 188.)

"The standard is whether the court's decision was an abuse of discretion under the totality of the circumstances [citation], not whether the court correctly listed factors or whether any one factor should have been weighed more heavily in the balance."  (*People v. Lawrence, supra*, 46 Cal.4th at p.196.)

Here, appellant  told the trial judge, "I thought that I was going to be able to be – you know, be ready for trial as my own lawyer, but I don't think I'll be able to do it."  The court noted that appellant was granted pro per status four months earlier and that court proceedings took place thereafter during which defense motions were heard, funds were appropriated for the defense, and an investigator was appointed.  The court asked again for the reason that appellant was not prepared to represent himself.  Appellant replied, "Well, I just feel that I can't do it by myself, going into trial by myself."  The court then reminded appellant that he was advised of the difficulties regarding self-representation, and appellant stated, "Well, I mean, at the time I thought that I would be able to, you know, be able to fight it for myself – fight the case for myself, but now that I

5

sit here, I mean, I don't think I could take it to trial by myself, so --." The court asked, "All right. Do you have anything further?" Appellant replied, "No." The People objected to reappointment of counsel. The court denied appellant's motion.

Several other matters were then discussed. The prosecutor turned over GSR evidence to appellant. She said that she had previously informed appellant that the result was positive, but appellant's investigator had never contacted her to obtain a copy of the report. All parties discussed a potential plea agreement. Counsel for co-defendant Venegas stated that his defense "is not necessarily in line with" appellant's defense.

After lunch, there was a further discussion of a potential plea agreement, but appellant ultimately rejected the prosecution's offer. After a brief recess, appellant again told the court, "Your Honor, I don't feel I can proceed with this. . . I mean I don't even know what I'm doing, so –" The court stated that it was foolish to chose self-representation. Appellant stated, "That's why I'm trying to give up my status." The court replied, "It's a little late in the game for that. So what are we doing? We're going to take his cuffs off." The following exchange took place: [¶] "The Court: . . . Mr. Estrada. I understand that, but this is something you should have brought up a long time before. [¶] [Appellant]: I did, Your Honor. I brought it up to Judge Ocampo's attention, and he told me to bring it up to your attention. [¶] The Court: I know. Mr. Estrada, I've denied it. You're going to be representing yourself. I wish you luck. [¶] [Appellant]: I mean, is that fair? That's not. [¶] The Court: It is fair. You made a choice. You made a decision. [¶] [Appellant]: I do have the right to be – to have a PD, don't I? [¶] The Court: You're going to explain the law to me, Mr. Estrada? [¶] [Appellant]: So I don't? You're telling me that I don't have the right to have a PD? [¶] The Court: Not today you don't. Mr. Estrada, these are the choices you have made. [¶] [Appellant]: I mean, I don't know what I'm doing, so how are you going to make me, you know, pick jurors when I don't know what I'm doing? [¶] The Court: Mr. Estrada, we're going to go forward."

6

Here, as the trial court recognized, appellant was properly advised of the dangers and consequences of self-representation before he was granted self-representation. He initialed an advisement acknowledging he was aware that "depending on the stage of my case, if I change my mind and request an attorney, the court may deny my request and I may have to proceed without an attorney." (Compare *People v. Cruz* (1978) 83 Cal.App.3d 308, 320 [defective waiver of counsel to begin with was a factor supporting reappointment of counsel].)

Further, after appellant was granted self-representation on May 17, the court set May 23 as "zero of ten" for trial. Appellant asked for more time, but the court denied the request and told appellant that he would not be given special treatment over that of a defendant who was represented by counsel. Thus, appellant was aware that last minute requests for continuances to prepare for trial were not favored and if he waited until the last minute to request reappointment of counsel, that request could be denied. Appellant nonetheless waited until the day set for trial to request reappointment of counsel. The untimeliness of appellant's request weighs against granting it, particularly in light of his knowledge that last minute requests are disfavored.

Further, granting the request would have required a continuance to allow new counsel to prepare for trial. This would have been true even if appellant's former counsel were available. Much had occurred since that counsel was involved in the case. Further, this was a complicated case, involving seven percipient witnesses and ten law enforcement witnesses, several of whom were technical or expert witnesses. There can be no question that a continuance would inconvenience these witnesses, and rescheduling them all for a new trial date would be a difficult and lengthy task. There would also necessarily have been disruption to the court's schedule. Appellant points out that he made his request to the pretrial judge, before the matter was sent to a trial court and a jury called. The disruption would have been virtually the same even if appellant's motion had been heard by the pretrial judge. The disruption and delay weigh against reappointment of counsel.

7

Appellant did not provide a compelling reason for seeking reappointment of counsel. He simply said that he felt unable to represent himself. At that point, appellant had been representing himself for about four months. As the court noted, during those four months, defense motions were heard, funds were appropriated for the defense and an investigator was appointed. Appellant did not provide reason for his change of heart about his ability to represent himself. "[A] defendant's asserted ineffectiveness at self-representation does not demonstrate an abuse of discretion" because all self-represented defendants are in the same situation. (*People v. Lawrence, supra*, 46 Cal.4th at p. 196.)

On appeal, appellant points out that he received some last minute discovery from the prosecutor concerning a GSR test, and suggests that this evidence may have been the reason he felt unable to represent himself at trial. (See *People v. Elliott* (1977) 70 Cal.App.3d 984, 995 [prosecution's last minute offer of proof that defendant committed an uncharged crime was a factor weighing in favor of reappointing counsel].) Appellant did not claim in the trial court that the GSR evidence was the reason he was seeking counsel and thus we cannot fault the trial court for failing to consider it. Similarly, appellant states on appeal that counsel for co-defendant "advised" on the day of trial that co-defendant's defense would be at odds with appellant's defense, and suggests that this may also have been a reason that he felt unable to represent himself. Appellant did not make this claim in the trial court.

Against the numerous factors which weighed against reappointment of counsel, there were two which weighed in its favor. Appellant did not have a history of substituting counsel or changing back and forth between self-representation and being represented by counsel. There were no indications that appellant's request for counsel was made simply to delay the trial.

In light of the totality of the circumstances, the trial court did not abuse its discretion in denying appellant's request for reappointment of counsel.

Appellant contends the trial court "took the position" that once appellant made the decision to represent himself and been warned of the dangers, "that decision was cast in stone. It could not be changed." We do not agree. If the court took any position, it was

8

that appellant could not seek reappointment of counsel at the last minute without providing a compelling reason for his request. This is not contrary to the law.

Appellant implies that when the trial court acknowledged that appellant was ill-equipped to represent himself and then discussed a plea agreement, the trial court was telling appellant that the only way he could avoid life in prison was to take the prosecutor's offer of 28 years, "pitting one constitutional right against another." It is not clear what appellant means by this last phrase. Appellant had given up his right to counsel four months earlier. He retained his right to a jury trial. On the day of trial, he was not being forced to choose between those two rights; he had already chosen. Further, we see nothing improper about the trial court's remarks. The trial court was simply telling appellant that by waiting until the day of trial to seek reappointment of counsel, appellant had put himself in a bad position. The trial court was correct.

2. Sufficiency of the evidence – gang enhancement

Appellant contends there is insufficient evidence to satisfy the "primary activities" element of the section 186.22 gang enhancement found true by the jury in this case. He contends such a finding violated his federal constitutional right to due process.

"In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence and to special circumstance allegations. [Citation.] [I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] We do not reweigh evidence or reevaluate

9

a witness's credibility.  [Citations.]"  (*People v. Nelson* (2011) 51 Cal.4th 198, 210 [internal quotation marks omitted].)

Section 186.22, subdivision (b) requires proof that a felony "was committed for the benefit of, at the direction of, or in association with any criminal street gang." Section 186.22, subdivision (f) defines criminal street gang as "any ongoing organization, association, or group of three or more persons" that has "as one of its primary activities the commission of one or more" of the criminal acts listed in section 186.22, subdivision (e).  As relevant here, murder, assault with a deadly weapon, robbery, prohibited possession of a firearm and felony vandalism are among the crimes listed in subdivision (e).

"Sufficient proof of the gang's primary activities might consist of evidence that the group's members consistently and repeatedly have committed criminal activity listed in the gang statute.  Also sufficient might be expert testimony as occurred in [*People v. Gardeley* (1996) 14 Cal.4th 605].  There, a police gang expert testified that the gang of which *Gardeley* had for nine years been a member was primarily engaged in the sale of narcotics and witness intimidation, both statutorily enumerated felonies.  [Citation.]  The gang expert based his opinion of conversations he had with *Gardeley* and fellow gang members, and on 'his personal investigations of hundreds of crimes committed by gang members,' together with information from colleagues in his own police department and other law enforcement agencies."  (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 324.)

Appellant makes a two-pronged attack on Detective Sumner's testimony about the gang's primary activities.  First, he contends the detective never actually testified about the primary activities of the gang.  The detective testified as follows:  [¶]  "Prosecutor: Now, CV BKM, once they went from becoming a tagging crew that, basically, just did graffiti, to becoming a full fledged criminal street gang, do they have some primary activities that they engaged in?  [¶]  Sumner:  Yes.  [¶]  Prosecutor:  And you stated before some guys are better at different types of crimes, correct?  [¶]  Sumner:  Just like deputies are better at different types of jobs.  [¶]  Prosecutor:  Different specialties?  [¶] Sumner:  Different specialties.  [¶]  Prosecutor:  Okay.  What are the primary activities,

10

let's call it the specialties of CV BKM? [¶] Sumner: Common things for Compton Varrio Born Krazy Minded is they're always caught with guns. They always have guns, whether they're selling them, just carrying them, moving them around, they always have guns. They steal cars. Vandalism is very common. [¶] Prosecutor: Are those the primary activities that, in your experience, you have found are the types of crimes that members of CV BKM have most often engaged in? [¶] Sumner: That and shootings. [¶] Prosecutor: Have you personally investigated gun possession cases, vandalism cases, car theft cases, shootings committed by members of CV BKM? [¶] Sumner: Yes."

Appellant argues that the expert's use of the word "common" somehow indicates that the listed activities were not the primary activities of the gang. We do not agree. The detective was directly answering a question about primary activities when he used the word "common." Immediately after this response, the prosecutor asked "Are those the primary activities" that members of "CV BKM have most often engaged in?" The detective responded, "That and shootings." Taken as a whole, the detective's testimony did identify the primary activities of the gang as gun related crimes, car theft, vandalism and shootings. (See *People v. Margarejo* (2008) 162 Cal.App.4th 102, 107 ["the jury has ample reason to infer that [the expert's] answer implicitly incorporated the word 'primary' from the question. Ordinary human communication often is flowing and contextual. [The defendant's] objection here calls for an unreasonably restrictive interpretation of the [the expert's] answer, which we respectfully decline."].)

Appellant also contends that the detective's testimony showed only that BKM committed misdemeanor vandalism, which is not a crime listed in section 186.22, subdivision (e). In his answer about primary activities, the detective referred only to "vandalism" without specifying whether it was misdemeanor or felony vandalism. When the detective offered proof of crimes committed by the gang, however, one of those crimes was specifically identified as felony vandalism. Thus, the detective's testimony as a whole is most reasonably understood as referring to felony vandalism.

Appellant also argues that Detective Sumner was not qualified as an expert and his testimony lacked foundation. Appellant did not object on these grounds in the trial court

11

and has forfeited them on appeal. (See *People v. Bolin* (1998) 18 Cal.4th 297, 321 [forfeiture of claim that witness was not qualified as an expert]; *People v. Nelson* (2012) 209 Cal.App.4th 698, 710-711 [forfeiture of foundational deficiency claim].)

Assuming the issue were not waived, we would see solid expert qualifications and ample foundation for the detective's testimony. Detective Sumner had been a Compton police officer for 14 years, and had worked in the gang unit since 2007. Although BKM was not on his list of assigned gangs in the gang unit, he had broad experience with gangs. He had contact with over a hundred gang members a day when he worked in the county jail for a year, interviewed gang members for three years while working intake at the inmate reception center, patrolled Compton and learned about Compton in the process for about five years, investigated and interviewed gang members as an investigator since 2007, handled hundreds of Compton gang cases, taught and lectured about Black and Hispanic gangs and the Mexican Mafia, and was one of the first deputies to be interested in BKM. Further, he had personally investigated BKM crimes and spoken with BKM members. This is more than sufficient to qualify Detective Sumner as an expert and to provide a foundation for his opinion. (See, e.g., *People v. Martinez* (2008) 158 Cal.App.4th 1324, 1330.) Some of the detective's knowledge did come from speaking with other detectives, but experts are permitted to rely on hearsay. (See *People v. Campos* (1995) 32 Cal.App.4th 304, 307-308 [expert witnesses may rely upon reliable hearsay in forming their opinions]; *People v. Sisneros* (2009) 174 Cal.App.4th 142, 154 ["admission of expert testimony based on hearsay will not typically offend confrontation clause protections"]; see also *People v. Sengpadychith, supra,* 26 Cal.4th 324 [gang expert relied on information from colleagues].)

3. Jury Instruction on gang enhancement

Appellant contends the trial court erred in instructing the jury that it was required to find that the gang "has as one or more of its primary activities, the commission of vandalism, gun possession, car theft and shootings." He contends that the trial court should have instructed the jury on the difference between felony and misdemeanor

12

vandalism, and also instructed the jury that only felony vandalism could be a qualifying primary activity of the gang. We see no error.

There was no testimony or argument in this case about misdemeanor vandalism. As we discuss, supra, Detective Sumner's testimony as a whole identifies felony vandalism as a primary activity of the gang. One of the convictions offered to show a pattern of criminal activity by the gang was a conviction for felony vandalism. There is nothing to indicate that the jury was even aware that the crime of misdemeanor vandalism existed. The jury's task was not to decide whether one of BKM's primary activity was misdemeanor or felony vandalism; it was to decide whether to accept or reject Detective Sumner's testimony that one of BKM's primary activities was felony vandalism.

To the extent that appellant contends the trial court was required to instruct on the elements of vandalism, he is mistaken. The only authority he cites for this claim is a suggestion in the Bench Notes for the instruction. As respondent points out, the Bench Notes also say that the court need not instruct on the elements of a crime when it has been shown by a conviction. That was the case here.

13

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


MINK, J.[*]


We concur:



TURNER, P. J.



MOSK, J.

_____

[*] Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14