Filed 10/21/14  P. v. Vilchis CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G047762 |
| v. | (Super. Ct. No. 09NF3148) |
| ALEX BRYAN VILCHIS, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, David A. Hoffer, Judge. Affirmed in part, reversed in part and remanded.

Tonja R. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and William M. Wood, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury found defendant Alex Bryan Vilchis guilty of the first degree murder of George Springer (Pen. Code,[1] §§ 187, subd. (a), 189; count one), conspiracy to commit an assault with a deadly weapon (§§ 182, subd. (a)(1), 245, subd. (a)(1); count two), and active participation in a criminal street gang (§ 186.22, subd. (a); count three).  The jury further found a firearm use allegation true in connection with the murder (§ 12022.53, subds. (d), (e)(1)) and the murder and the conspiracy were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).  The court sentenced defendant to 25 years to life on the murder conviction and a consecutive 25 years to life term on the firearm use allegation.  It stayed punishment on counts two and three pursuant to section 654.

Defendant raised a large number of issues.  Although there is sufficient evidence he committed a first degree murder, we conclude his conviction for that offense murder must be reversed based on prejudicial instructional error.  (*People v. Chiu* (2014) 59 Cal.4th 155 [defendant cannot be convicted of deliberate and premeditated murder based on natural and probable consequences theory].)  This determination renders moot a number of defendant's arguments on appeal.  We reject his remaining contentions and affirm his convictions for conspiracy and active participation in a criminal street gang.

I

FACTS

*Nathaniel Avalos*

In September 2009, Nathaniel Avalos (Nate) celebrated his 19th birthday with a backyard party at the Buena Park home of his mother, Juanita Arriola, and his stepfather, George Springer.  There was a disk jockey and 30 to 100 partygoers present.  Ingress and egress were through the side gate to the yard.  Everyone at the party, Hispanics, Asians, Whites, and Blacks, were friends of Nate's or friends of friends.

---

[1] All undesignated statutory references are to the Penal Code.

No gang activity took place at the party. Then, around midnight, a number of uninvited people arrived. Nate said "probably six" bald Hispanic males wearing plaid Pendletons and baggy shorts entered the backyard. A woman may have entered with them. They stood out among the college students attending the party. Shortly after they got there, they made racists remarks to Nate's Black friends. According to Nate, the intruders who looked like gang members were "just itching for a fight . . . or something." Bottles were thrown and gang names were called out.

Arriola and Springer "had enough" and made the uninvited males leave. Nate's parents attempted to "herd[]" them out, when Arriola was hit in the chest with a bottle, which upset Springer and he began to move the uninvited men out at a quicker pace. They exited through the gate. Springer and Nate followed them from a distance to keep an eye on them, until the uninvited males were six to 10 houses away. As they were leaving, one pulled up his shirt, as if he wanted to start a fight. Words were exchanged. Nate could hear someone in the background trying to stop the more vocal one in their group. He heard some say they should get a good look at Springer so they would know who "to come back and blast." Nate said he heard defendant say, "[W]e'll come back. Just leave him. We'll come back." As the group kept walking away, Nate returned to the party.

Springer kept a gun locked in his truck. It had been his father's and Nate had seen Springer with it in the past, but Springer had never had to use it. He had it for protection only. In all the years Springer had the gun, Nate never saw him handle it. Later, Nate saw his aunt, uncle, mother, and Springer together at the front of the house. Springer put the gun into his waistband. He said he needed it to protect his family. The others told him he did not need it.

About 30 minutes later, Nate heard a loud boom. He ran to the front yard and saw a flash. Springer was on the ground, with his gun in his hand as if he had been

3

aiming at something, but the gun was too heavy.[2]  Springer was going into shock.  Nate did not see the shooter's face because his view was blocked by a tree, but he could see the person wore a blue plaid shirt and black shoes.  When Nate lifted Springer's shirt, he saw "a bunch of holes" in the left chest and stomach area.  He concluded Springer had been shot with a shotgun.  While attending to Springer, Nate heard a car leave, "skidding off."

Nate said the shooter wore the same clothing as the person who said they would be back.  However, as Nate did not see the shooter's face, he said he could not say it was the same person.

*Jose Bautista*

Jose Bautista was charged with Springer's murder, conspiracy, and active participation in a criminal street gang along with defendant and Dylan Salazar.  Additionally, Bautista was charged with a count of attempted deliberate and premeditated murder and active participation in a criminal street gang based on another incident.  Bautista expected to be permitted to plead to a lesser charge, most likely manslaughter, with a sentence of 13 to 19 years in state prison, if he testified against defendant.

Bautista said he was a member of the Barrio Pobre gang in 2009.  He was 15 years old at the time of the time Springer was killed, and had joined the gang the year before, after being "jumped" into the gang.[3]  Bautista said it was good for gang members to get involved in violence to show who they are and to benefit the gang.

Bautista was with defendant and Salazar on the night of Nate's birthday party.  They went to two parties that night.  They were drinking at the first party and

---

[2] Detectives later determined Springer's gun was jammed.

[3] To be "jumped" into a gang, the initiate is assaulted by three gang members for a set amount of time.

4

having fun.  Bautista said he was drunk, Salazar appeared to be under the influence, and defendant was drinking a big bottle of vodka.

Bautista did not know who or what the first party was for.  While at the first party, they heard about a second party from a girl named Myra.  The second party was supposed to have more people, more beer, and more fun.  When Myra left to go to the second party, Bautista, Salazar, and defendant followed in a car driven by another gang member, "Casper."  "Stretch" followed them in a third vehicle.  They went to the second party and everything was fine until "all of a sudden hell broke loose."

Bautista said he was dancing with Myra and about 20 minutes after arriving, defendant got into an argument with a girl.  She asked him where he was from and he shouted out "Anaheim Barrio Pobre gang."  Ten to 15 members of the Del Monte Bloc Crips gang, a rival of the Barrio Pobre gang, were at the party.  Members of the two gangs started yelling at each other.  Bottles were thrown.  Myra stayed, but Bautista, Salazar, defendant, and Casper got kicked out of the party and left.  Bautista said "the whole party" did not want the Barrio Pobre members there.

According to Bautista, "some older guy and his wife" were kicking them out.  Salazar got into a verbal confrontation with the man.  Bautista, Salazar and defendant each called out their gang's name, and someone said they will be back.  Bautista said the man that was kicking them out said he was from Hawaiian Gardens.  The three yelled back derogatory terms for members of Hawaiian Gardens.

Casper, Bautista, and Salazar left in one vehicle and defendant left with Stretch in another.  They all met at "Traviesa's" house in Cypress.  Traviesa, a female, is also a Barrio Pobre gang member.  Bautista stayed in the car.  Salazar and Casper got out.  Stretch and defendant got out of Stretch's vehicle and the four spoke together.  Someone put a gun wrapped in a sweater in to the backseat of Casper's car.  Casper, Bautista,

5

Salazar and defendant rode back to Nate's party in Casper's car. Stretch followed in his vehicle.

Bautista said defendant grabbed the shotgun as soon as they got back to the party. Bautista, Salazar, and defendant got out of the car. The three walked toward the house, defendant in the middle. Defendant fired twice at Springer. Bautista and Salazar ran back to Casper's car. Defendant ran to Stretch's. They all drove away and met up at another Barrio Pobre gang member's house. Bautista said they were nervous and excited with the pride of having done something for the neighborhood. Defendant burst into tears and said he loves the neighborhood. They all hugged each other and then went their separate ways.

*Recordings*

Salazar was the first to be arrested. According to Bautista, Salazar "gave out everybody's name." After defendant was also arrested, he and Salazar were placed together in a cell in juvenile hall. Their conversation was recorded. They spoke about their gang, the crime, and statements Salazar was reported to have made to the police. Defendant asked Salazar if he told police "we were there." Salazar said he did. Defendant accused Salazar of being a snitch. During the conversation, defendant said nobody could see Salazar when he (Salazar) "shot him."

Defendant and Bautista were also placed together in juvenile hall and their conversation was recorded. At one point defendant told Bautista to say defendant "wasn't there." Defendant instructed Bautista to make up a story and say defendant was home sleeping. Defendant said he hoped Bautista did not say anything about him because he would find out if Bautista did. There were times during the recording when Bautista and defendant whispered such that the recording did not pick up what was being

6

said.  Bautista testified they whispered because they thought they might be recorded and when they whispered they were talking about the shooting and planning what to say.

*Gang Evidence*

Gang Investigator Jeff Dodd of the Anaheim Police Department testified as a gang expert.  He testified Barrio Pobre is a criminal street gang with approximately 30 members as of September 13, 2009, and its primary activities are felony vandalism and possession of weapons.  He discussed how gang members earn respect by committing crimes for the gang or intimidating members of the community.  The more violent the crime, the more respect is garnered.  Dodd opined defendant was an active member of Barrio Pobre on the date of the killing based on defendant's police contacts.  One of those contacts was reflected in a STEP notice served on defendant in April 2009, by an officer who did not testify at trial.  Dodd said the shooting in this case benefitted the gang because it elevated the status of the gang and those who participated in the shooting.

*Defense Case*

Nate's next door neighbor was in front of his house around midnight on the night of the party.  He saw a male Hispanic get out of a light colored vehicle and walk northbound toward the party, carrying a shotgun.  A girl approached the male and unsuccessfully attempted to stop him.  The neighbor heard the girl tell the male "Don't do it."  The neighbor went back into his residence and thereafter heard two shots.

Nancy Gutierrez attended Nate's birthday party with Myra and Myra's brother.  That was the second party they had been to that night.  While at the first party, Myra received a call from a friend about another party.  Gutierrez said Bautista was at the first party.  Myra, her brother, and Gutierrez then went to Nate's party.  A carload of Myra's friends—male Hispanics, wearing baggy clothes—followed them to Nate's party.

7

Gutierrez and Myra decided to leave Nate's birthday party after the bottle throwing incident. They told Myra's brother to meet them at their truck. Gutierrez and Myra got to the truck and realized Myra's brother had the keys. Gutierrez walked back to the party, got the keys, and headed back to the truck while Myra's brother said his good-byes. She saw three cars in the middle of the street. She then saw Salazar walking toward the party, carrying a gun. She also saw a woman she believed to be Nate's mother. Afraid Myra's brother might get shot, Gutierrez got in front of Salazar and said, "Don't kill him." Salazar was by himself. There were no other individuals around him. Gutierrez then saw Myra's brother walking toward the truck. She went to him and told him they had to leave because shooting was about to start. Gutierrez and Myra's brother ran toward the truck and Gutierrez heard gunshots.

Defendant's mother testified defendant helped her with a yard sale at their residence in Corona on September 12, 2009, from approximately 6:00 a.m. to 7:30 p.m. She saw him just when she went to bed at 9:00 p.m. and he was in his room, "laying down," the next morning at 10:00 a.m.

*Rebuttal*

Over defendant's objection, Arriola, Nate's mother, was permitted to testify in rebuttal. She testified that after the individuals who looked like gang members were asked to leave, she confronted Salazar about why his groups acted the way they did. The rest of Salazar's group were further up the driveway from Arriola and Salazar. She identified defendant as having been present. The group, including Salazar, left. Arriola turned around and announced loudly the "party is over."

Three from the group returned about 20 to 30 minutes later. Arriola, Springer, and another male were in front of the residence when the group returned. Springer had his gun in his pants. Arriola noticed the returning group as they were in her

8

neighbor's driveway. She heard defendant say, "Now what? Now what?" Salazar laughed. He had nothing in his hands. Arriola did not see a gun in defendant's hands, but said he had his hands as if he was carrying a gun.

Arriola ran into the garage and turned around to see if Springer had followed. She went back out, saw Springer, and heard a "poof" that did not sound like a gunshot, but Springer turned toward her and said, "I'm hit." He fell to his left knee and pointed his gun. Arriola then saw a flame, but did not hear anything. Springer fell and curled up into a ball.

Arriola gave the police a description of the shooter but was unable to identify defendant from photographic lineups or a book of photographs (gang book) she was shown. She ultimately identified a single photograph of Salazar. Arriola attended the preliminary examination for defendant, Salazar, and Bautista. It was then she realized defendant was the shooter. Arriola had not previously told the prosecutor she could identify defendant.

*Surrebuttal*

Arriola was shown a photographic lineup with defendant's photograph in it on September 14, 2009. She did not identify defendant. She was shown another photographic lineup containing a more recent photograph of defendant on September 18, 2009. She again did not identify defendant.

II

DISCUSSION

A. *Arriola's Testimony*

As noted above, Arriola testified in rebuttal defendant appeared to have a gun just moments before Springer was fatally shot. The prosecutor did not intend on calling Arriola as a witness during defendant's trial. She was not on the prosecutor's

9

witness list. Neither did the prosecutor call her as a witness in Salazar's earlier trial. The defense did. The decision to call Arriola as a witness was not made until the conversation the prosecutor had with Nate and Arriola after Nate's testimony, and Arriola said defendant was the person with a gun just before the shooting. Thereafter the prosecutor attempted to put Arriola on the witness stand during the case-in-chief, but after a hearing held outside the presence of the jury, the court held she could not testify in the prosecution's case-in-chief as she had been present in court during defense counsel's opening statement.

During the hearing outside the presence of the jury, Arriola testified she was in court during opening statements and left the courtroom before her son Nate testified. When Nate left the courtroom after testifying, mother and son discussed his testimony. Arriola overheard Nate tell the prosecutor he had been confused while testifying. Arriola thought he might be upset he had not been a better witness for the prosecution. Arriola told the prosecutor she believed defendant was the person who had the gun and shot Springer. She said she could not say if defendant was the shooter, but he had the gun that night.

Arriola had also attended the preliminary examination and saw all three defendants there. She did not tell the prosecutor or the detective defendant was the person who had the gun. She also attended Salazar's trial. During that trial she saw a photograph of the three defendants and recognized defendant as the person who had the gun. Arriola said she told the detectives who questioned her after the shooting who had the gun, but she had not told anyone else because she had never been asked. She said over the last three years she posted on Facebook statements that defendant had a gun that night and walked up to Springer, saying "Now what? Now what?"

The court stated there was a strong chance Arriola's presence in court during counsel's opening statement was the reason she could make identification. The

10

court did not permit Arriola to testify in the prosecution's case-in-chief. The court concluded Arriola's testimony would be "evidence of the most dramatic nature." The prosecutor then stated she would offer Arriola's testimony in rebuttal based on the defense's opening statement to the effect that defendant had nothing to do with the shooting. The court permitted Arriola to testify in rebuttal, after Gutierrez testified as a defense witness that Salazar had the shotgun when she confronted him just before the shooting. The court denied the defense request to continue the matter for 30 days so Facebook records could be subpoenaed, stating Facebook records would be cumulative given Arriola's testimony at the earlier hearing outside the presence of the jury was "all over the place."

Defendant contends the trial court violated section 1093 and his constitutional right to due process (U.S. Const., 14th Amend.; Cal. Const., art. I, § 15) and effective assistance of counsel (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15) by permitting Arriola to testify after she listened to defense counsel's opening statement. We disagree.

Section 1093 sets forth the order of proceedings in trial, absent a contrary order as directed by the trial court. This section permits the presentation of rebuttal evidence at the conclusion of the defense's case-in-chief. (§ 1093, subds. (c), (d).) The purpose of section 1093 is "to assure an orderly presentation of evidence so that the trier of fact will not be confused; to prevent a party from unduly magnifying certain evidence by dramatically introducing it late in the trial; and to avoid any unfair surprise that may result when a party who thinks he has met his opponent's case is suddenly confronted at the end of the trial with an additional piece of crucial evidence." (*People v. Carter* (1957) 48 Cal.2d 737, 753.) Consequently, "proper rebuttal evidence does not include a material part of the case in the prosecution's possession that tends to establish the defendant's commission of the crime. It is restricted to evidence made necessary by the

11

defendant's case in the sense that he has introduced new evidence or made assertions that were not implicit in his denial of guilt. [Citations.]" (*Id*. at pp. 753-754.)

Section 1094 authorizes a trial court, in its sound discretion, to alter the order of proceedings in section 1093. The court's discretion in this regard is broad. (*People v. Goss* (1992) 7 Cal.App.4th 702, 706.) In exercising its discretion, the court may even permit the prosecution to reopen its case-in-chief after the defense has made a motion for acquittal under section 1118.1. (*People v. Riley* (2010) 185 Cal.App.4th 754, 764-765; cf. *People v. Goss*, *supra*, 7 Cal.App.4th at p. 708 [permissible after section 1118 motion when right to jury trial has been waived].)

Here, defendant did not testify, but he did introduce the testimony of Gutierrez. She testified she ran into Salazar as she was leaving the birthday party and Salazar was carrying a gun. The clear implication was defendant did not carry the gun and was not the shooter. Arriola's testimony rebutted that evidence. Moreover, defendant was not surprised by the content of Arriola's testimony. He knew what she would testify to six days earlier when she testified outside the presence of the jury and while the prosecutor was still presenting her case-in-chief.

On the other hand, the subject of her testimony—seeing defendant carrying a firearm just before the shooting—was something that, all things being equal, should have been presented in the prosecution's case-in-chief. However, it appears the prosecutor did not know of Arriola's observation until Arriola told her after Nate's testimony. Thus, this is not a situation where the prosecutor knew about the evidence and elected not to introduce it in the case-in-chief and to introduce it in rebuttal where it would have a more powerful impact. In fact, as soon as the prosecutor learned of Arriola's observation, she brought it to the court's attention in an effort to introduce it in her case-in-chief.

12

The defense knew prior to the presentation of its case the prosecutor would seek to introduce Arriola's testimony in rebuttal if relevant. Had the defense not introduced evidence of Salazar carrying the shotgun just before the shooting, there would have been nothing for the prosecution to respond to in rebuttal. Contrary to the prosecutor's assertion, the contents of defense counsel's opening statement does not trigger the right to introduce rebuttal evidence. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1088 [evidence admitted on rebuttal only "to disprove a fact" *introduced into evidence* by the defense].) That the prosecution and defense did not learn of Arriola's assertion until the trial was already underway, does not mean the defense is free to introduce evidence immune from impeachment on rebuttal. We therefore conclude, given the facts of this case, the trial court did not err in permitting the prosecution to introduce Arriola's testimony in rebuttal.

The procedure followed in this matter did not undermine "'the ultimate "integrity of the fact-finding process."' [Citation.]" (*Ohio v. Roberts* (1980) 488 U.S. 56, 64.) Again, this matter does not involve a situation where the prosecutor attempted to hide a witness and then spring her on the defense at the last second. Moreover, the defense was given a dry run of Arriola's testimony six days before she testified. Her rebuttal testimony was not so fundamentally unfair as to deprive defendant of due process.

Neither did admission of Arriola's testimony deny the defendant his right to confrontation. Defendant not only confronted and cross-examined Arriola at trial, he got a preview of her testimony when she testified six days earlier and was cross-examined outside the presence of the jury. Thus, defendant was in a better position than most faced with a rebuttal witness.

Permitting Arriola to testify on rebuttal did not deny the defense the opportunity to investigate the case and prepare for trial, important components of the

13

right to the effective assistance of counsel. (*Kansas v. Ventris* (2009) 556 U.S. 586, 590.) Rebuttal witnesses are not a rarity in criminal trials. And continuances are not the sine qua non of a rebuttal witness being permitted to testify. The defense had the police reports in this matter. We have no reason to believe Arriola was not listed in those reports. Thus, the defense knew who was present during the incident. It had substantial time in which to interview Arriola prior to trial. Her existence was not a surprise. We cannot, therefore, conclude defendant was denied the opportunity to investigate and prepare for trial. Granted, Arriola was not on the prosecution's witness list, but defense counsel do not wait to begin their investigation until the prosecution issues a witness list approximately 30 days before trial.

Defendant also contends the trial court's denial of a 30-day continuance to subpoena records from Facebook and to interview other witnesses in preparation for Arriola's testimony violated his right to due process, effective assistance of counsel, and confrontation. Defense counsel had some time to prepare for Arriola's testimony, albeit not the time necessary to subpoena records from Facebook. Still, the defense had more time than it normally has to prepare for a rebuttal witness. Moreover, the defense did not request a procedure to permit it to obtain information from Arriola's Facebood account in a much shorter period of time. It could have requested the court order to Arriola to open up her Facebook account so the court could view her postings in camera and inform the defense *if* her testimony regarding postings on Facebook was inaccurate. We therefore conclude the trial court did not err in denying the defense's request to continue the trial for 30 days once the prosecution offered Arriola's testimony. Moreover, had the defense continued with its discovery attempts notwithstanding the lack of a 30-day continuance, surely it would have brought a new trial motion had it determined Arriola had not identified defendant as the shooter in her Facebook postings, or if it discovered any other impeaching evidence after Arriola testified.

14

Section 1050 gives the court discretion in determining whether to grant a continuance of a trial. (§ 1050, subd. (d).) We find the trial court did not abuse its discretion in denying a 30-day continuance here.

Defendant also contends the trial court prejudicially erred when it denied his motion for a mistrial in connection with Arriola's testimony. Because we have found the trial court did not err in permitting Arriola's rebuttal testimony, we necessarily find introduction of the testimony did not irreparably damage defendant's chance at a fair trial (see *People v. Ayala* (2000) 23 Cal.4th 225, 282), and a mistrial was not required.


B. *Confrontation*

Defendant argues the trial court violated his constitutional right to confrontation (U.S. Const., 6th Amend.) when it entered into evidence a STEP notice card relied upon by the gang expert. A STEP notice is a form signed by a gang member acknowledging he is a member of a criminal street gang. It informs the member that he may be prosecuted as a gang member subject to additional enhancements. Defendant was issued a STEP notice on April 29, 2009. According to the gang expert, who did not serve the notice on defendant, defendant signed the document. Dodd said defendant told the investigator who served him with the notice that he backs up the Barrio Pobre gang despite his no longer living in the neighborhood. Defendant objected to admission of the STEP notice on hearsay grounds. He noted the card was not prepared by Dodd and contained information not testified to by Dodd, such as the fact that it states defendant had been hanging out with the gang for two years and he got into a fight while incarcerated with someone from another gang. The court admitted the STEP notice into evidence notwithstanding the fact that all the information contained therein had not been mentioned in Dodd's testimony, and stated it would instruct the jury not to use the contents of the STEP notice for the truth of the matters asserted therein, but rather as a

15

basis for Dodd's opinion as a gang expert. In arguing for redaction of those matters contained in the STEP notice and not discussed by Dodd in his testimony, defense counsel asserted the admission of the STEP notice into evidence violated defendant's state and federal Constitutional rights. The court admitted the STEP notice into evidence over defendant's objections.

Defendant contends admission of the STEP notice violated his right to confrontation under the Sixth Amendment. His hearsay objection did not preserve the Sixth Amendment confrontation issue for appeal. (*People v. Raley* (1992) 2 Cal.4th 870, 892.) Neither did his general objection that admission of the STEP notice would violate defendant's constitutional rights. "It is 'the general rule that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal.' [Citations.]" (*Ibid*.) The failure to raise the Sixth Amendment confrontation issue in the trial court forfeited the issue on appeal.

Even had the claim been preserved, it would fail. The Sixth Amendment guarantees a criminal defendant the right "to be confronted with the witnesses against him." (U.S. Const., 6th Amend.) In *Crawford v. Washington* (2004) 541 U.S. 36, the Supreme Court held the confrontation clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." (*Id*. at pp. 53-54.)

The *Crawford* court did not delineate the limits of what constitutes testimonial hearsay. "We leave for another day any effort to spell out a comprehensive definition of 'testimonial.' Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." (*Crawford v. Washington*, *supra*, 541

16

U.S. at p. 68, fn. omitted.) The court used "the term 'interrogation' in its colloquial, rather than any technical legal, sense," and included statements made "in response to structured police questioning." (*Id*. at p. 53, fn. 4.) In *Davis v. Washington* (2006) 547 U.S. 813, 821, the court clarified that only *testimonial statements* implicate a defendant's Sixth Amendment right of confrontation. Even then, the confrontation clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted. [Citation.]" (*Crawford v. Washington*, *supra*, 541 U.S. at p. 60, fn. 9.) Statements made to law enforcement officials in response to questioning "are not testimonial if given and taken for nonevidentiary purposes such as the need to cope with ongoing emergencies. [Citation.]" (*People v Cage* (2007) 40 Cal.4th 965, 987.)

The United States Supreme Court has not said whether the Sixth Amendment confrontation clause is violated when a gang expert bases his or her opinion on statements by witnesses who are not present at trial and who the defendant has not had the opportunity to cross-examine. However, prior to the decision in *Crawford v. Washington*, *supra*, 541 U.S. 36, the California Supreme Court held hearsay statements testified to by a gang expert as a basis for his or her expert opinion are not offered for the truth of the matter asserted. (*People v. Gardeley* (1996) 14 Cal.4th 605, 619.) That conclusion is binding on us. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Thus, even if the statements are deemed to be testimonial, the confrontation clause would not bar their admission given they were not offered for their truth. (*Crawford v. Washington*, *supra*, 541 U.S. at p. 60, fn. 9; see also *People v. Sisneros* (2009) 174 Cal.App.4th 142, 153-154 [confrontation clause applies to testimonial statements offered for their truth, not statements relied on by expert in forming opinion]; *People v. Ramirez* (2007) 153 Cal.App.4th 1422, 1427 [*Crawford* did not condemn hearsay used to support expert's opinion]; *People v. Cooper* (2007) 148 Cal.App.4th 731,

17

747 [*Crawford* applies to substantive use of hearsay evidence, not with evidence admitted for nonhearsay purpose]; *People v. Thomas* (2005) 130 Cal.App.4th 1202, 1210 ["*Crawford* does not undermine the established rule that experts can testify to their opinions on relevant matters, and relate the information and sources upon which they rely in forming those opinions."].)  Because our Supreme Court has held the information contained in STEP notices are admitted as a basis for the gang expert's opinion and not for the truth of the statements (*People v. Gardeley*, *supra*, 14 Cal.4th at p. 619), the trial court did not err in admitting the evidence over defendant's Sixth Amendment objection.

## C. *The First Degree Murder Conviction*

Defendant was prosecuted for first degree murder under three possible theories.  The prosecutor argued the jury could convict defendant as the direct perpetrator, and if the jury did not find defendant was the shooter, then he could be convicted as one who aided and abetted the killer and shared the killer's state of mind, or as an aider and abettor under the natural and probable consequences doctrine.  The court also instructed the jury on the three theories of first degree murder liability.

Our Supreme Court recently decided *People v. Chiu*, *supra*, 59 Cal.4th 155, holding a defendant cannot be convicted of first degree murder under a natural and probable consequences theory.  (*Id*. at pp. 158-159.)  The court found that due to the vicarious nature of liability under the natural and probable consequences theory (*id*. at p. 164), "the connection between the defendant's culpability and the perpetrator's premeditative state is too attenuated to impose aider and abettor liability for first degree murder under the natural and probable consequences doctrine, especially in light of the severe penalty involved . . . ."  (*Id*. at p. 166.)

Because the prosecutor argued defendant could be found guilty of first degree murder based on the natural and probable consequences doctrine and the court

18

instructed on that theory in connection with the first degree murder charge, we must determine whether these errors were harmless. (See *People v. Chiu*, *supra*, 59 Cal.4th at p. 167.) Unless we can conclude beyond a reasonable doubt the jury did not convict defendant of first degree murder on the natural and probable consequences doctrine of aider and abettor liability, we must reverse defendant's conviction. (*Ibid*.) There was evidence to the effect that defendant was the shooter, but there was also evidence to the effect that Salazar, not defendant, was the shooter. Had defendant been charged with and the jury found true defendant *personally used* a firearm under section 12022.5, subdivision (a), rather than a firearm use allegation under section 12022.53, which does not require personal use and applies to vicarious use in the commission of a gang crime (*People v. Garcia* (2002) 28 Cal.4th 1166, 1171), we would be able to conclude the jury's determination of guilt was not based on the natural and probable consequences doctrine. But that did not happen and there is nothing in the record to suggest the jury did not convict based on the natural and probable consequences doctrine. Although there is sufficient evidence defendant committed a first degree murder, we must reverse his conviction for that offense because we cannot conclude the jury did not convict the defendant on the improper natural and probable consequences theory.

D. *Remaining Issues*

Because we reverse defendant's first degree murder conviction, we need not address his argument that the trial court erred in instructing the jury pursuant to CALCRIM No. 400 because it failed to properly describe the offense of first degree murder. Neither need we address the court's failure to instruct on premeditation and deliberation in connection with the natural and probable consequence doctrine, or defendant's ineffective assistance of counsel claim based on a failure to object to the jury being instructed pursuant to CALCRIM No. 400.

19

Defendant was 15 years old at the time of the charged incident and complains his sentence of 50 years to life violates the Eight Amendment prohibition against cruel and unusual punishment. As we have reversed his conviction for murder, he no longer is sentenced to 50 years to life and the issue is moot.

Lastly, defendant argues the cumulative effect of errors in this case require reversal. Given we have reversed defendant's conviction for first degree murder and found no other errors, there is no cumulative error to assess.

### III

### DISPOSITION

Defendant's conviction for first degree murder is reversed. The judgment is otherwise affirmed and the matter is remanded to the superior court for retrial.

MOORE, ACTING P. J.

WE CONCUR:

IKOLA, J.

THOMPSON, J.

20