Filed 11/13/14  P. v. Sanchez CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D064673 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD237319) |
| RUBEN J. SANCHEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Jeffrey F. Fraser, Judge.  Affirmed.

Nancy Olsen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Lynne G. McGinnis, and Kristine A. Gutierrez, Deputy Attorneys General, for Plaintiff and Respondent.

Ruben J. Sanchez appeals from a judgment convicting him of murder with firearm use and gang enhancements.[1]  He argues the judgment must be reversed because (1) the standard instruction on eyewitness identification should not have been given as it was misleading, and (2) the trial court erred in admitting evidence of his handwritten rap lyrics.  We find no reversible error and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

At about 9:45 a.m. on September 12, 2011, Raymond Garcia was fatally shot while walking on a street in the Encanto area of San Diego.  Victim Garcia was a member of an Encanto gang known as Varrio Encanto Locos (VELS) and defendant was a member of a rival "protective custody" gang known as Two-Five.  Prosecution experts explained that the Two-Five gang is a prison gang consisting of gang members who have dropped out of other gangs; the Mexican Mafia prison gang is an enemy of Two-Five; and the victim's Encanto gang, which is a "sureño" gang under the umbrella of the Mexican Mafia, is likewise a Two-Five enemy.

When interviewed by the police after his arrest, defendant stated that people in Encanto told him to remove his Two-Five tattoos or he would be killed if he did not get out of the neighborhood.  The prosecution argued that defendant shot the victim in retaliation for an assault on defendant that was committed in Encanto by the victim's half brother (Henry Gonzales), a high ranking member of the VELS gang.  The defense maintained defendant was not at the scene of, nor a participant in, the shooting.

---

1     Defendant is also known as Ruben Carranza.

2

As we shall detail below, the prosecution presented numerous items of circumstantial evidence to support its claim that defendant was a participant in the shooting, including that defendant had made statements indicating he wanted to take revenge against Gonzales; in the moments before the shooting defendant was talking on his cell phone at a residence in close proximity to the scene of the shooting; shortly thereafter, he put something in the belt area of his pants and rushed away in a truck that matched eyewitness descriptions of the truck at the scene of the shooting; and after his arrest he made statements to family members and others suggesting his involvement in the shooting.

*Events Before the Shooting*

Several prosecution witnesses, including defendant's son (Quentin Carranza) and another relative (Melissa Cogar), testified that about three weeks before the shooting, defendant was "jumped" on Radio Drive by Gonzales (the victim's half brother) and another man while Carranza and Carranza's female cousin were present. According to Cogar, defendant repeatedly talked about the assault and could not "get over it," saying on multiple occasions that "when he sees that motherfucker, he's going to kill him"; he "was going to kill [Gonzales] right on the spot"; and he "wanted [Gonzales] so bad." Cogar had seen defendant with a gun, and a few days before the shooting she saw him on her back porch cleaning bullets with a rag.

Mark Zettel, who had loaned his truck to defendant on previous occasions, testified that at about 6:30 or 7:00 a.m. on the morning of the shooting, defendant called Zettel and they arranged to meet at a house in Spring Valley to see if a man there wanted

3

to buy a shotgun from defendant. While defendant was waiting outside the man's residence in a car driven by another person, Zettel was inside the man's house for several hours until he determined the man did not want to buy the shotgun. When Zettel went outside to look for defendant, defendant was gone. Zettel had left his keys inside his truck and he discovered his truck was also gone.

Cogar lived in the Encanto area about 1.4 miles from the location of the shooting. She testified that defendant arrived at her house at about 9:00 a.m. on the morning of the shooting. She heard defendant talking fast on his phone, saying "Is he there? He's there?" Defendant then put something in the belt area of his pants, rushed out of the house, and "left out of [her] driveway [like] crazy" in Zettel's truck. Cogar knew the truck belonged to Zettel because about four or five days earlier defendant and Zettel had come to her house in the truck.

*Identification Evidence*

The shooting, which occurred on Radio Drive in Encanto, was observed to some extent by two prosecution witnesses (Alexis Carrion and Lorena Gonzalez[2]) and a defense witness (Lance Adarne). Carrion was pulling out of his driveway when he saw a pickup truck pull up to victim Garcia as Garcia was walking on the street; the truck occupants and Garcia "exchanged a few words"; and Carrion heard the victim yelling or arguing and saying something like " 'no.' " Carrion then heard gunfire, and saw that Garcia had been injured. The truck sped off, and Carrion pulled his car over and called

---

[2] To avoid confusion with the victim's half brother (Henry Gonzales), we refer to Lorena Gonzalez as Lorena.

4

911. Lorena heard the gunfire while she was inside her home on Radio Drive. When she looked out the window, she saw a truck "screeching" down the road at a fast speed. Adarne, who was outside Carrion's residence saying goodbye to Carrion, noticed a red truck parked on the street and a "Mexican bald guy" standing next to the passenger side of the truck. When Adarne started walking back towards the house, he heard gunshots; as Adarne ran to Carrion's car to check on him, the truck sped away.

The three eyewitnesses (Carrion, Lorena, and Adarne) described the truck they saw at the scene as a Ford F-150; an older model from the early 2000's, 1990's, or earlier; faded red or burgundy in color; silver, chrome, or gold trim at the bottom; and in dirty, "[b]eaten up" condition.[3] Zettel described his truck as a red 1995 Ford F-150, and in somewhat "rough" condition with dents and broken windows. Similarly, Cogar described Zettel's truck as an older model red truck that was "kind of beat up." Zettel testified that on the morning of September 12 he had a lot of clothing and other items in the back of his truck, and Cogar likewise testified there were a lot of black trash bags in the back of the truck when defendant left her residence that morning.

When shown photos of Zettel's truck, Carrion testified the photos matched his description of a red truck with silver trim at the bottom; Lorena testified the photos could depict the truck she saw but she was not sure; and Adarne testified "[t]hat is not the truck,

---

3    More specifically, Carrion described the truck as a red Ford, from the 1990's or early 2000's, two doors, and with a "boxy look" and silver or chrome trim at the bottom. Lorena described it as "faded red," perhaps a Ford or GMC, from the 1990's, 1980's or earlier, and an "older, heavier-style" model. Adarne described the truck as dirty, faded red or burgundy, Ford F-150, an "old modern" style from about 1991 or 1992, "[b]eaten up," and having an extended cab and gold or silver trim at the bottom.

5

but it's similar." Lorena and Adarne thought some of the photos depicted a truck that had newer paint than the faded paint they saw on the truck at the scene. When Zettel viewed photos of his truck, he acknowledged that in one photo it looked shinier and cleaner than it had on September 12 and he had probably washed it. Cogar also noticed that in one of the photos Zettel's truck looked a lot cleaner, newer, and shinier than it did on September 12. The main discrepancy in the evidence concerning the truck was that Adarne claimed the truck at the scene had an extended cab, whereas Zettel's truck did not have that feature.[4]

As to the occupants of the truck at the time of the shooting, Lorena was unable to provide any information, but Carrion and Adarne provided some descriptions. Carrion stated there were two Hispanics in the truck in their 20's to 30's; he thought the shots came from the passenger side; and the driver had a dark complexion and somewhat long hair (five to six inches) that had a "spiked, slicked-back look to it." Adarne was unable to describe the passenger, but stated the driver was 40 to 45 years old and of medium build or a "little bit skinny"; he had salt-and-pepper slicked-back hair about four inches long, a two-to-three inch long goatee, acne scars on a "potato nose," and tattoos on his left arm including of a female with long hair and a hat; and he was wearing a white tank top and reading-type glasses.

When shown a picture of defendant, Carrion acknowledged that defendant's appearance did not match Carrion's description of the driver (i.e., dark complexion with

---

[4]     Carrion and Lorena were unsure whether or not the truck had an extended cab.

spiky, slicked-back hair), but he stated he could not tell whether or not defendant was the driver because there was a glare from the sun on the truck's windshield that prevented him from getting a "good look" at the truck's occupants. Adarne likewise did not think a photo of defendant looked like the driver, noting that unlike his description of the driver, defendant did not have facial hair, a potato nose, or acne scars.[5] When shown photos of defendant's tattoos, Adarne testified they did not look like the driver's tattoos, and, unlike defendant, he did not recall the driver having neck tattoos. Prior to trial, Carrion and Adarne were unable to identify a suspect in a photographic lineup that included defendant's photo.

At trial, Adarne qualified his descriptions by saying that he only got "a glance" at the driver and the truck because he was focused on running to check on Carrion as the truck sped away. Also, he explained that since childhood he had a disability that caused memory problems, made it difficult for him to process information and to remember details, and sometimes caused him to "merge" observations so that he would take pieces of information that he got from one observation and put them together with another observation. He testified that he thought he had seen the driver at a party and the truck on other occasions in Lemon Grove, but that because of his memory problems he would not be able to identify the driver or the truck if he saw them again.

---

[5] The record reflects that at the time of the shooting defendant was 49 years old.

7

*Other Evidence Concerning Events at the Time of and After the Shooting*

Cogar testified that shortly after leaving her home on the morning of September 12, defendant returned, still in Zettel's truck. Also, another man arrived whom Cogar did not know; the other man was a dark-skinned Mexican about 29 or 30 years old and he had a car outside. Defendant stayed for about one hour at her home, and the other man stayed about 20 minutes. Cogar later heard that Gonzales's brother had been shot on Radio Drive, and that her house "was going to get hit up" because it was defendant's "headquarters."[6]

Defendant's cell phone records showed that in the minutes before and/or after the shooting (at 9:20, 9:44, and 9:46 a.m.), he repeatedly spoke on his phone with a person who resided about 600 feet from the scene of the shooting. Defendant's calls during this time period used cell phone towers that matched the towers serving Cogar's residence, Radio Drive, and a two-mile radius from the scene of the shooting. His calls on September 12 after the shooting used cell phone towers that suggested he was moving away from the Encanto area and that he eventually arrived in Spring Valley.

Nine days after the shooting, when the police went to arrest defendant at the Spring Valley residence of his friend Mara Hewitt, defendant attempted to flee out the back yard but was apprehended. In a recorded interview, defendant told the police he was at Hewitt's house in Spring Valley at the time of the shooting. He denied that he had an altercation with the victim's half brother several weeks before the shooting, that he

_____

[6]     Due to threats she received, Cogar and her children were later placed in a witness protection program and relocated.

8

was in Encanto at the time of the shooting, that he knew someone with a red truck or that he was in a red truck. The police had received information linking Zettel's truck to the murder, and after inputting the truck's license plate number into a computer tool that contains randomly-collected photographs of license plates, they saw that the day after the shooting (September 13) Zettel's truck was at a location about one-half block away from Hewitt's residence where defendant was arrested.

Defendant's stepdaughter (Kassondra McCall) testified that in a September 2011 recorded phone call with defendant while he was in jail, he told her to get his son out of Encanto and she should stay out of Encanto. He also told her that she should tell Hewitt to "make sure nobody says . . . nobody knows nothing." McCall later reported to defendant that Hewitt told her that "everyone was keeping their mouth shut." Defendant also sent his daughter a copy of a police report in which the names of Gonzales, Cogar, and Zettel had been redacted, but in which defendant had handwritten their names above the redactions. A prosecution gang expert testified that in the gang culture, the writing of a name above a redacted name is a means to identify the person as a "snitch" who was cooperating with an investigation and who would be targeted in the gang community.

The prosecution also introduced jail recordings of defendant's phone conversations with his sons, during which he told them to "[m]ake sure everybody is quiet"; "everybody needs to shut the fuck up"; and "everybody just keeps their mouth shut and everybody does what they're supposed to do. Nobody tries to do me, you know?"

In February 2012, a deputy sheriff reviewed a letter defendant wrote to a female while he was in jail in which he stated, "I'm facing murder charges. I'm up against it, but

9

let's face it, it's hard but it's fair.  I know that was a rough job when I took it.  And if I didn't like the conditions, I should have kept my happy ass at home.  Two major positives.  One, I can still take deep breaths, unlike the victim.  Ouch.  Cruel, but true.  And, number two, there's you.  Not a murderess, but all in all."

In July 2012, a deputy sheriff found in defendant's property a paper with handwritten rap song lyrics that the deputy had heard defendant reciting.  The lyrics referred to defendant's Two-Five gang and talked about his involvement in gang-related killings, saying, for example, " 'I hunt sur rats around the clock.  I'm on a murder spree.  [¶] . . . [¶] . . . I'm a Two-Five factor.  Fuck a sureño and an EME.  [¶] . . . [¶]  I smoke South Side fools at no cost to me.' "  The prosecution's gang experts testified that the lyrics referred to killings of the Mexican Mafia and sureños or South Siders who pledge allegiance to the Mexican Mafia.  The gang experts also testified that jumping a rival gang member in front of family members is "the ultimate sign of disrespect" that requires severe consequences, and if a Two-Five gang member responds to such an assault by shooting and killing the assailant's brother in the rival gang's territory, this would benefit the Two-Five gang by showing the gang is a "force to be reckoned with."

*Jury Verdict and Sentence*

Defendant was charged with first degree murder with a gang enhancement and two gun enhancements:  (1) personal discharge of a gun causing death and (2) a principal's personal use of a gun causing death with a gang benefit finding.  The jury convicted him of the murder charge, the gang enhancement, and the second gun enhancement (principal's personal use with gang benefit).  It found the first gun enhancement (personal

10

discharge) to be not true. Defendant was also found to have incurred a serious felony prior conviction and a strike prior conviction.

The trial court sentenced defendant to 50 years to life for the murder (25 years to life, doubled based on the strike), 25 years to life for the gun use/gang benefit enhancement, and five years for the serious felony prior. The court stayed the sentence on the gang enhancement.

## DISCUSSION

### I. *Instruction on Eyewitness Identification*

Defendant argues the trial court erred by instructing the jury with the standard instruction on eyewitness identification testimony (CALCRIM No. 315) without modifying the introductory sentence to the instruction. The instruction commences by stating "*[y]ou have heard eyewitness testimony identifying the defendant*," and then cautions the jury that it must decide the truthfulness and accuracy of the eyewitness's testimony and lists a variety of factors to consider for this purpose. (CALCRIM No. 315, italics added.)[7] He asserts the introductory sentence was erroneous and misleading in his

---

[7]     The jury was instructed with CALCRIM No. 315 as follows: "You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony. [¶] In evaluating identification testimony, consider the following questions:
• Did the witness know or have contact with the defendant before the event?
• How well could the witness see the perpetrator?
• What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance, and duration of observation?
• How closely was the witness paying attention?
• Was the witness under stress when he or she made the observation?

11

case because none of the eyewitnesses identified him as the suspect in the shooting. He posits that the instruction "permitted the jury to conclude [he] was actually identified by an eyewitness based upon evidence that did not amount to an eyewitness identification" and thereby undermined his primary defense that there was no eyewitness identification implicating him in the shooting.

In reviewing a claim that an instruction was incorrect or misleading, we inquire whether there is a reasonable likelihood the jury applied the instruction in an erroneous manner. (*People v. Butler* (2010) 187 Cal.App.4th 998, 1013.) We "view the instructions as a whole and consider the effect of the challenged instruction in the context of the entire trial." (*People v. Mills* (2012) 55 Cal.4th 663, 678.)

In this case, the eyewitnesses did not point to defendant and say he was the person at the scene of the shooting. Rather, the eyewitnesses provided descriptions of the vehicle and of the persons they saw in the vehicle, which the jury could use to evaluate whether these descriptions supported that defendant was a participant in the shooting or,

---

• Did the witness give a description and how does that description compare to the defendant?
• How much time passed between the event and the time when the witness identified the defendant?
• Was the witness asked to pick the perpetrator out of a group?
• Did the witness ever fail to identify the defendant?
• Did the witness ever change his or her mind about the identification?
• How certain was the witness when he or she made an identification?
• Are the witness and the defendant of different races?
• Was the witness able to identify the defendant in a photographic or physical lineup?
• Were there any other circumstances affecting the witness's ability to make an accurate identification?
The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find . . . the defendant not guilty."

contrariwise, suggested he was not one of the persons at the scene. Arguably, in a case such as the one before us, the introductory sentence in CALCRIM No. 315 can be viewed as imprecise to the extent it suggests there were eyewitnesses who *directly* identified the defendant as the perpetrator or suspect by, for example, stating he was the person they saw commit the crime or saw at the scene. We note the introductory sentence in the CALJIC version of the eyewitness identification instruction appears to be better suited to a case, as here, where the eyewitness testimony provides indirect, but not direct, identifying information. In this regard, CALJIC No. 2.92 states: "Eyewitness testimony has been received in this trial *for the purpose of* identifying the defendant as the perpetrator of the crime[s] charged." (Italics added.)

In any event, viewing the record as a whole, there is no reasonable likelihood the jury was misled by the language stating "there was eyewitness testimony identifying the defendant." We assume jurors are reasonably intelligent persons. (*People v. Butler, supra*, 187 Cal.App.4th at p. 1013.) Because the jurors knew what evidence was presented, they knew there were no eyewitnesses who were able to directly identify defendant as being one of the persons in the truck at the time of the shooting. Applying their common sense, the jurors would not have relied on the introductory sentence to the instruction to find the existence of evidence that they knew did not exist.

The lack of error is also supported by counsel's closing arguments to the jury which never intimated that there was direct eyewitness identification of defendant. Counsel presented at length their differing views on whether the *circumstantial evidence* supported that defendant was a participant in the shooting, based on such factors as

13

descriptions of the truck at the scene as compared to the truck defendant allegedly borrowed from Zettel; information about defendant's cell phone calls near the time of the shooting; defendant's motive to kill the victim; and defendant's postshooting statements. The prosecutor explicitly recognized that identification of defendant as a participant in the shooting turned on circumstantial evidence, stating: "So looking at identification, where is the evidence [of] identity? It comes from a variety of sources here. We have circumstantial evidence, phone records, cell site, motive, gang evidence, false alibi by the defendant, consciousness of guilt. [¶] . . . [¶] When you look at all the evidence, the phone evidence, opportunity, motive, jail calls, gang evidence, circumstantial evidence, the defendant's own writings, it all points to one person, one person only. The defendant . . . ."

Also, in closing arguments both counsel referred to the eyewitness identification instruction (CALCRIM No. 315) when presenting their differing views on whether defense witness Adarne's descriptions of the truck and its occupants *excluded* defendant as a perpetrator. Arguing that Adarne's descriptions were unreliable, the prosecutor cited CALCRIM No. 315 and encouraged the jury to discredit his descriptions based on some of the factors delineated in that instruction (including stress and an opportunity to view). Defense counsel urged the jury to consider the factors set forth in the eyewitness identification instruction, and commented that the "funny part" was that whereas the instruction stated "you have heard evidence that a witness has identified the defendant," in this case "you've heard evidence that the witness *hasn't* identified the defendant." (Italics added.) Thus, although the jury was urged to consider the factors set forth in

14

CALCRIM No. 315, this was not done in the context of suggesting there was eyewitness testimony directly identifying defendant.

To support his claim of error, defendant notes that in closing arguments the prosecutor made a comment that a portion of Adarne's description of the driver matched defendant's appearance.[8]  Defendant posits that based on this comment, the jury might have mistakenly interpreted the introductory sentence of the instruction to mean that Adarne "actually identified" defendant.  We are not persuaded.  The prosecutor's comment did *not* suggest that Adarne *directly* identified defendant as one of the people in the truck; rather, the comment merely referred to indirect identification evidence based on the view that part of Adarne's description of the driver matched defendant's appearance.  To the extent the jury might have viewed Adarne's description as supporting the prosecution's claim that defendant was a perpetrator, this was a finding it was entitled to make, and there is nothing to indicate that any such finding would have been erroneously derived from CALCRIM No. 315's reference to the existence of eyewitness testimony identifying defendant.

---

[8]     The prosecutor made this passing comment in the context of arguing the unreliability of Adarne's descriptions excluding defendant as a perpetrator, stating: "[H]ow else do we know his identification or, in this case, his exclusion is unreliable? And I'm not just saying that because he excludes the truck . . . *because, frankly, his identification of the salt-and-pepper hair and the reading glasses matches the defendant.* [¶]  But I'm not going to pick and choose what helps me and what hurts me.  You're just going to look at it independently and objectively.  And does he have the opportunity to be able to make an identification?  Even taking out his mental history, the answer is absolutely not."

15

It is apparent from the record that all understood there was no direct eyewitness identification of defendant, and there is nothing to suggest the jurors would have viewed the introductory sentence to CALCRIM No. 315 as somehow creating direct identification evidence that they knew had not been presented to them. There is no reasonable likelihood the jury applied the instruction in an erroneous manner.

For the same reason, even assuming the trial court should have sua sponte clarified the instruction to distinguish between direct and indirect eyewitness identification testimony, or that defense counsel provided ineffective representation by failing to request this clarification, any error in this regard was harmless under any standard of review. (See *People v. Beltran* (2013) 56 Cal.4th 935, 955 [reasonable probability of different outcome standard for state law error generally applies to misleading instruction]; *People v. Rogers* (2006) 39 Cal.4th 826, 872 [federal constitutional standard of harmless beyond a reasonable doubt applies when error deprives defendant of right to present complete defense].) Because reasonably intelligent jurors would not have relied on the instructional language to find the existence of direct identification evidence that they knew did not exist, there is no reasonable possibility the instruction improperly affected the jury's verdict. (See *People v. Riggs* (2008) 44 Cal.4th 248, 311.)

## II. *Admission of Defendant's Rap Lyrics*

Defendant argues the trial court erred in admitting the evidence of his rap lyrics because the evidence was minimally relevant and more prejudicial than probative.

Relevant evidence means evidence that has any tendency to prove or disprove any disputed material fact. (*People v. Sisneros* (2009) 174 Cal.App.4th 142, 151.) The trial

16

court has broad discretion to determine whether evidence is relevant, and whether the evidence should be excluded under Evidence Code section 352 because its probative value is outweighed by concerns of undue prejudice. (*People v. Horning* (2004) 34 Cal.4th 871, 900.) " 'The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair.' " (*People v. Jablonski* (2006) 37 Cal.4th 774, 805.) Undue prejudice does not exist merely because highly probative evidence is damaging to the defense case, but rather arises from evidence that uniquely tends to evoke an emotional bias against the defendant or cause prejudgment of the issues based on extraneous factors. (*People v. Doolin* (2009) 45 Cal.4th 390, 438-439.) We do not disturb the trial court's ruling unless the court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.)

During pretrial motions, the prosecutor argued the lyrics were relevant to the issues of identity, motive, and the gang allegation. Over defense objection that they were unduly prejudicial, the trial court ruled the lyrics admissible.

The trial court could reasonably conclude the rap lyrics, which referred to defendant's Two-Five murder sprees against gang rivals, were highly relevant to support that defendant had a motive for the murder, which in turn was relevant to the disputed issue of identity, and that he acted for the benefit of his gang. (See *People v. Zepeda* (2008) 167 Cal.App.4th 25, 35.) The jury could reasonably infer that defendant's writing of the rap lyrics reflected that he was highly motivated to advance Two-Five's position in

17

the neighborhood. This inference could in turn support that if the jury found defendant had an altercation with a rival gang member in the weeks before the shooting, his mental state was such that he might seek to retaliate with a high level of force in order to defend his gang's reputation, including by attacking the rival gang member's brother.

The relevancy of the rap lyrics was also supported by the nature of defendant's responses when questioned by the police about the shooting. During the police interview defendant acknowledged "they don't want" him in Encanto because he was a member of the Two-Five protective custody gang and that anyone who did not have "two five" on them was his "enemy"; however, he also told the police that he did not have a "beef" with anybody in Encanto and he did not "mess with" anybody or cause any problems in the neighborhood. The rap lyrics could support an inference that, contrary to defendant's claim to the police, he was *not* oriented towards maintaining peace in the neighborhood vis-à-vis enemies of Two-Five but rather was determined to defend his gang's honor even to the level of murder.

To support his claim of minimal relevance, defendant notes that the lyrics do not mention anything about the victim or the shooting of the victim. Even though the lyrics do not mention targeting Garcia, the trial court could reasonably find them to be of substantial relevance because Garcia was a member of a rival gang and the lyrics showed defendant's commitment to his gang and glorification of violence perpetrated against a gang rival.

As to prejudicial effect of the lyrics, the evidence did not present the jury with information that might cause the jury to rest its verdict on irrelevant extraneous factors.

18

Defendant's orientation towards gang-related violence was highly relevant to the question of whether he engaged in a retaliatory shooting against a rival gang member. Further, the jury's not true finding on the personal gun discharge allegation shows that the jury carefully evaluated the evidence and did not return verdicts based on an emotion-based assessment of defendant's interest in gang violence.

Defendant also asserts the lyrics should have been excluded because there was ample other evidence to support his gang-related motive, and hence the evidence was cumulative and more prejudicial than probative. A trial court has wide latitude to admit evidence relevant to motive. (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550.) Because the lyrics had significant probative value to show defendant's allegiance to his gang and to support the prosecution's claim that he had a motive to commit the murder, the court was not required to exclude them on cumulative grounds. (*People v. Zepeda, supra*, 167 Cal.App.4th at pp. 34-35.)

The record shows no abuse of discretion in admission of the rap lyrics.

### III. *Claim of Cumulative Reversible Error*

Defendant argues the cumulative effect of error requires reversal. We reject this contention. There was no error in admission of the rap lyrics, and to the extent clarification of the eyewitness identification instruction might have been warranted, as we explained, there is no reasonable possibility any such error affected the outcome.

19

DISPOSITION

The judgment is affirmed.

HALLER, J.

WE CONCUR:

McCONNELL, P. J.

AARON, J.