[No. B205535. Second Dist., Div. Five. May 21, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSEPH A. SISNEROS, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts II. through VI. of the Discussion.

COUNSEL

Jeralyn B. Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Paul M. Roadarmel, Jr., and Jaime L. Fuster, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KRIEGLER, J.**—The jury found defendant Joseph A. Sisneros guilty of the first degree murder of Luis Charles (Pen. Code, § 187, subd. (a))[1] by intentionally and personally discharging a firearm (§ 12022.53, subds. (b)–(d)). He was also convicted of being a felon in possession of a firearm (§ 12021, subd. (a)(1)) and actively participating in felonious criminal conduct to benefit a criminal street gang (§ 186.22, subd. (a)).[2] Defendant admitted the truth of recidivist enhancement allegations, which included two "strikes." The trial court imposed a 10-year determinate term for the two section 667 recidivism enhancements, plus indeterminate terms of 75 years to life pursuant to the three strikes law, and 25 years to life for the firearm enhancement.

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

[2] The jury separately found defendant committed the murder and weapons offense for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).

Upper terms of three years were imposed for the felon in possession and the gang participation convictions; both were stayed pursuant to section 654.

In his timely appeal, defendant raises various contentions of error arising out of the trial court's decision to permit the prosecution to call Gloria Luna as a witness with the knowledge that she would refuse to be sworn and submit to questioning: (1) In violation of Evidence Code section 600, there was no admissible, nonspeculative inference that could be drawn from Luna's refusal; (2) the jury's consideration of her refusal violated defendant's right to confront adverse witnesses under the Sixth Amendment; (3) the jury's consideration of Luna's silent conduct also violated Evidence Code section 710 and defendant's right to due process under the state and federal Constitutions because convictions cannot be based on unsworn testimony; and (4) the court abused its discretion under Evidence Code section 352 in permitting Luna to be called as a witness. Defendant also raises two interrelated arguments arising out of Agent Daniel Evanilla's expert testimony[3] as to defendant's status as a Mexican Mafia associate, contending first, the gang expert's reliance on hearsay reports resulted in the expert's passing off the opinions of nontestifying experts as his own in violation of Evidence Code section 801, and second, the hearsay materials on which Agent Evanilla relied were improperly admitted for their truth, in violation of his constitutional rights to confront adverse witnesses under *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] (*Crawford*). Additionally, defendant contends (1) his trial counsel rendered constitutionally ineffective assistance by effectively alerting the prosecution to the availability of recidivist enhancements against defendant; (2) the court improperly admitted unduly suggestive and unreliable identification evidence through the testimony of prosecution witness Victor Davila, thereby violating his constitutional due process rights; and (3) the above issues, if not prejudicial singly, amounted to a miscarriage of justice when considered cumulatively. Finally, defendant contends the imposition of a state court construction penalty was improper under Government Code section 70372. We agree with the final contention, but otherwise affirm.

## STATEMENT OF FACTS

It was stipulated for purposes of the felon in possession count that defendant had suffered a prior felony conviction.

On January 25, 2005, Paul "Pelon" Morales was staying with his friend Alfie, who lived on Buelah Avenue in the territory claimed by the Geraghty

---

[3] The prosecution's gang expert from California's Department of Corrections and Rehabilitation (the Department).

Loma gang. Morales is a member of that gang. At approximately 4:00 p.m., Morales was working on Alfie's car, which was parked on Buelah. He saw a familiar black Mitsubishi Gallant drive past him with defendant in the front passenger seat. Gloria Luna was driving. Morales often saw the Gallant parked in front of Luna's house, nearby on Buelah Circle, and he had seen Luna driving the car many times in the neighborhood, sometimes with defendant as her passenger. Morales knew defendant as "Joe-Joe." Morales waived at Luna and defendant as they drove past him slowly, travelling from the direction of Luna's house toward Geraghty Avenue. It was a narrow street with room for only one car to pass when, as at that time, there were cars parked on both sides.

Morales's friend "Pirate" stopped his van next to Morales with the engine running. Within a few minutes after the Gallant passed by, Morales heard two or three gunshots from the direction of Geraghty Avenue. Morales turned and saw defendant shooting Luis "Stranger" Charles, a Geraghty Loma gang member, who was lying on his back at the corner of Buelah and Geraghty.[4] Defendant fired another two shots at Charles before running to the Gallant. He got into the passenger seat and the car drove away.

Morales asked Pirate to drive him to the corner where the shooting took place. Pirate dropped him off at the intersection. Charles's girlfriend, "Sola," was on the front porch of Paul "Spider" Ortega's house. Morales approached Charles and asked if he was "all right." Charles was bleeding from his arm and calling to the people in Ortega's house to alert 911. Morales told him, "Hold on. Help is on the way." Charles did not answer when Morales asked who shot him.

Firefighter Victor Davila lived on Geraghty near the shooting location. He was at home at the time and heard five gunshots fired in quick succession. After waiting to make sure the shooting had stopped, Davila walked to his front gate and saw Luna's Gallant driving slowly northbound on Geraghty. From a distance of 10 feet, Davila saw the driver was a woman with dark, "wavy mousey hair"; the passenger was a bald male with a dark "chopped style moustache." They appeared to be "[o]lder type gangsters." There were no other cars driving on the street. Davila turned his attention to Charles, who was lying on his back and screaming in pain. Davila went back to his house for his medical bag, returning to give first aid to Charles. Charles told Davila he was having trouble breathing. There were four or five visible gunshot wounds, some of which had entered Charles's chest. Charles was taken away in an ambulance.

---

[4] Detective Gary Sica went to the crime scene and verified that a person would have a clear view from the location described by Morales.

Morales got along with Charles and considered him a "home boy." Morales got along with defendant too; they were "cool" with each other. Morales was aware of the prison gang called the Mexican Mafia or the "*Eme*." At the time of the shooting, Morales assumed defendant was a member of that gang. If anyone testified against such a gang member, he or she was likely to suffer violent retribution. Snitching on a Mexican Mafia associate would be extremely dangerous. Morales would not go back to the neighborhood of the shooting because he would risk being shot or beaten.[5] Morales received no deal in return for his testimony. He was on parole at the time of the trial. Even with defendant in custody, Morales was in danger of retribution for being a snitch.

Ortega lived on Geraghty for approximately 10 years, but moved away several months after the shooting incident. Ortega was a member of the Cantaranas gang, based in Santa Fe Springs. By the time of the shooting, however, Ortega had become friends with all his neighbors, including those from Geraghty Loma. His home had become a hangout for Geraghty Loma members. He was friends with Charles. Ortega was also acquainted with defendant, whom he knew as "Joe-Joe." On the day of the shooting, Charles and his girlfriend Marlene (whose gang moniker was "Sola") were visiting Ortega's house. Ortega was cooking. At approximately 4:00 p.m., Ortega heard four or five gunshots in front of his house. A few minutes later, he left the house alone and approached Charles, who was standing in front of his house; Charles had suffered bullet wounds to his stomach and left arm.

Charles eventually died from complications arising out of the multiple gunshot wounds he received.

Agent Evanilla, a gang expert, had monitored the activities of the Mexican Mafia since 1995. The prison gang was comprised of approximately 165 members and 1,200 "validated associates." The gang's primary activities are committing murders, robberies, extortions, and other crimes to raise money for the gang.[6] As part of the Mexican Mafia's creed, members and associates neither admit their affiliation with the prison gang nor cooperate with the police by informing on other members and associates.

Agent Evanilla's knowledge of the Mexican Mafia came from various sources, including his interviews with gang members and associates either when they are arrested, after being released, or when they attempt to leave

---

[5] On cross-examination, he admitted being arrested at Luna's house on Buelah after his first interview with the police. He was arrested for a narcotics offense.

[6] The expert testified as to two predicate criminal offenses to support the gang allegation and count. The court instructed that the evidence could be considered only to prove the gang allegation and count, and not to show defendant had a bad character or criminal disposition.

the gang. The latter instance involves a lengthy process of debriefing, including the inmate's written confession to all criminal activities committed, a detailed interview, and exhaustive investigation. Agent Evanilla had arrested more than 1,000 Hispanic street gang members, nearly 100 Mexican Mafia members, and approximately 300 gang associates. He also conducted four debriefings, including one of a Mexican Mafia associate.

The Department relies on a "validation system" to classify an inmate as a member or associate of the Mexican Mafia. An associate is an aspiring member who commits criminal activities on behalf of the gang as a necessary prerequisite for membership. A Mexican Mafia member will sponsor a person identified as "a good earner" for the gang—someone who obtains money for the gang by "taxation" of drug dealers on the street and drug sellers in prison. The aspiring member must also accept gang assignments to assault other inmates in the interest of the *Eme*. If the aspirant does well in these matters and receives the necessary sponsorship, his membership will be put up to a vote by the existing members. In addition, full-fledged membership requires the commission of a stabbing or killing on behalf of the gang. Leaving the gang will subject a member to being targeted for killing by the gang. Prison investigators monitor the prison activities, mail, and telephone calls of all Hispanic inmates from Southern California gangs to determine their status vis-à-vis the Mexican Mafia. If three independent investigators uncover a direct link between an inmate and a previously validated member or associate, the inmate will be deemed a validated member or associate. The Department reviews and updates its validations every six years.

While on the streets, members of Hispanic gangs in Southern California will attack members of rival Hispanic gangs. However, once in prison, all such gang members must eschew such rivalries in favor of allegiance to the Mexican Mafia and its rivals. At the same time, the Mexican Mafia exercises a supervisory role over Hispanic street gangs in Southern California by designating a representative in each street gang who is responsible for remitting a portion of the gang's criminal proceeds to the Mexican Mafia. Failure to cooperate with the Mexican Mafia in that regard or in refusing assignments will result in being put on a "green light" list, whereby gang members are targeted for killing by Mexican Mafia members and associates.

The expert believed defendant was an *Eme* associate based on his being validated by the Department in the early 1990's when he was incarcerated at Folsom State Prison. In connection with his six-year review in 2000, defendant did not dispute his *Eme* affiliation. The agent's opinion was bolstered by two recent incidents in county jail that showed defendant being treated as a Mexican Mafia associate. According to Agent Evanilla, victim Charles was a

Geraghty Loma gang member. At the time he was released from Pelican Bay State Prison in 2000, however, he was also a validated associate of the Mexican Mafia.

Based on a hypothetical set of facts that recapitulated the prosecution case for murder, Agent Evanilla opined the killing of Charles would have been committed to benefit the Mexican Mafia. The expert explained that the manner of the killing was not typical of a street gang driveby shooting in which the shooters would remain in the car and try to avoid being seen and identified. Here, the shooter got out of the car in broad daylight and committed the shooting with no regard to witness identification. This was consistent with the Mexican Mafia's reputation for witness intimidation. The manner of shooting was also consistent with Mexican Mafia protocol—and contrary to a street gang driveby—in that the shooter was careful to avoid shooting innocent bystanders.

## DISCUSSION

### I. *Luna's Refusal to Take the Witness Oath*

Defendant raises four interrelated claims of state law evidentiary error and federal and state constitutional violations arising out of the trial court's decision to permit the prosecution to call Luna as a witness, knowing she intended to remain silent and refuse the testimonial oath at the risk of being cited for contempt. To place those claims in context, we summarize the relevant trial court proceedings.

#### A. *Background*

On the fifth day of trial, Luna was taken out of custody and brought to court for a hearing outside the jury's presence. She was represented by her own counsel. The prosecution was aware of Luna's strong disinclination to testify, but argued she was subject to being called as a witness because she lacked a Fifth Amendment right against self-incrimination. Luna had been charged with murder along with defendant, but she entered a plea to being an accessory to the Charles murder and admitted the gang allegation. She received a seven-year term and did not appeal within the jurisdictional time period. Luna's counsel agreed that she had no constitutional right to remain silent, but informed the trial court that Luna would nevertheless refuse to be sworn as a witness and would refuse to answer any questions, despite the risk of being held in contempt. When the court asked Luna to confirm her attorney's representation, Luna refused to acknowledge the court.

Based on *People v. Lopez* (1999) 71 Cal.App.4th 1550 [84 Cal.Rptr.2d 655] (*Lopez*), the prosecutor requested that the trial court order her to testify in

front of the jury, allowing the jury to draw negative inferences from her refusal. The court advised Luna that she had no Fifth Amendment right to refuse to testify or to take the oath. Lacking any constitutional right to silence, the court would hold her in contempt of court if she refused the oath or refused to answer questions. Contempt was punishable by a jail term and a fine, which might affect her release date from prison. Luna refused to acknowledge the court.

The defense objected to Luna's being placed in front of the jury for any purpose. Her status as a prior codefendant "would raise certain issues about the right to confront and cross-examine a witness being called by the People." The defense argued that allowing the jury to draw a negative inference from her refusal would be improper because any inference would be purely speculative as to her motivation (e.g., love for defendant or fear of retribution).[7] Relying on *Lopez*, the trial court expressed its belief that the gang expert could properly rely on Luna's refusal in support of the opinion that gang culture inculcates fear of retaliation for testifying against gang members to intimidate potential witnesses.

The trial court ruled that Luna would be called and administered the oath. If she refused, she would be ordered to do so and advised her failure would result in a contempt citation. Contrary to the prosecution's position, the court ruled the prosecution would not be permitted to question Luna if she refused to be sworn.

Luna was called as a prosecution witness. When the clerk attempted to administer the oath, Luna made no response. The trial court asked whether she understood the clerk's request. Again, she made no response. The court advised Luna that she had no constitutional right to refuse the oath or to testify. When she made no response, the court ordered her to be sworn as a witness. In the face of Luna's continued silence, the court advised her that further refusals would merit a finding of contempt of court. Given "one last opportunity," Luna persisted in her silence. The court found her in contempt because she "refused to answer any questions of the court or to take the oath, in direct violation of lawful order of this court, in the presence of the court." The court added that her punishment would be determined at a later date. Following Luna's excusal, the court instructed the jury that "the appearance of the last individual and anything as a result of it is received for a limited purpose only. It is received only for [the] limited purpose as it may relate to any expert opinion offered by Agent Evanilla and for the basis of any expert opinion."

---

[7] The prosecutor pointed out that, as documented in an interview of Luna provided to the defense, Luna told Detective Sica she was afraid of deadly gang retribution if she testified against defendant. That information was never presented to the jury, but was used only at the hearing to show the prosecution's good faith.

Detective Sica testified as to Luna's identity: She was Gloria Luna and he had interviewed her on May 10, 2005. At that time, she volunteered her name and talked to the detective. In comparison with her appearance in court, at the time of their prior discussion, Luna's complexion was paler and her hair was not in a ponytail, but "a little more moussed up."

B. *Analysis*

In the first aspect of his claim, defendant argues the trial court's ruling violated Evidence Code section 600, subdivision (b),[8] because there was no admissible, nonspeculative inference that could be drawn from Luna's refusal of the oath. We review such evidentiary claims for abuse of discretion. (*People v. Weaver* (2001) 26 Cal.4th 876, 933 [111 Cal.Rptr.2d 2, 29 P.3d 103]; *People v. Siripongs* (1988) 45 Cal.3d 548, 574 [247 Cal.Rptr. 729, 754 P.2d 1306].) "A trial court abuses its discretion when its ruling 'fall[s] "outside the bounds of reason." ' [Citation.]" (*People v. Waidla* (2000) 22 Cal.4th 690, 714 [94 Cal.Rptr.2d 396, 996 P.2d 46].) " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "No evidence is admissible except relevant evidence." (*Id.*, § 350.) "[T]he trial court 'has broad discretion in determining the relevance of evidence [citations], but lacks discretion to admit irrelevant evidence' [citation]." (*People v. Weaver, supra*, at p. 933.)

The trial court did not abuse its discretion. There was solid, credible evidence that Luna drove defendant to the murder scene, witnessed the shooting, and facilitated defendant's flight. As is well established (and conceded below and on appeal), Luna had no Fifth Amendment privilege to remain silent: "When a defendant has already pled guilty to a charge, and time to appeal the conviction has run without an appeal being filed, the defendant's privilege to avoid compelled self-incrimination with regard to the facts underlying the conviction no longer exists." (*Lopez, supra*, 71 Cal.App.4th at p. 1554.) Moreover, generally speaking, "[n]o person other than a defendant has a right to refuse to be sworn as a witness [citations]." (*Id.* at p. 1555; see also *id.* at p. 1556 [" 'A witness may not employ the privilege to avoid giving testimony that he simply would prefer not to give,' " quoting *Roberts v. United States* (1980) 445 U.S. 552, 560, fn. 7 [63 L.Ed.2d 622, 100 S.Ct. 1358]].) Therefore, the prosecution was entitled to call her as a witness.

---

[8] That section of the Evidence Code defines a permissible inference as "a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action." (Evid. Code, § 600, subd. (b).)

Our review of the record confirms the reasonableness of the trial court's admission of Luna's courtroom conduct for the limited purpose of providing support for the gang expert's opinion. Agent Evanilla testified that defendant was an active associate of the Mexican Mafia. The expert opined that the Charles killing bore the hallmarks of a Mexican Mafia mission. The *Eme* typically targeted for violent retribution those who cooperated with law enforcement by informing or testifying against the gang's members and associates. In addition, the prosecution adduced evidence that witness Ortega believed defendant was affiliated with the Mexican Mafia and feared his testimony against defendant would subject him to gang retribution. Similarly, Agent Evanilla believed witness Morales, as a member of a Hispanic street gang, would have reason to know he risked Mexican Mafia retribution because of his testimony. With regard to Luna, the expert testified that although she was in custody in a women's facility, she remained a target for gang retribution if she were to cooperate with authorities by testifying.

■ Thus, evidence of the Mexican Mafia's penchant for witness intimidation was relevant to the prosecution case both as to the credibility of eyewitness testimony and as substantive evidence supporting the gang allegations. Luna's refusal to take the oath and testify provided strong support for the expert's opinion that the *Eme* engaged in witness intimidation. As the foregoing summary makes plain, the inference that Luna's refusal was motivated, at least in significant part, by fear of gang retribution cannot be dismissed as mere speculation. While it may not have been the only possible motivation, it was by far the most plausible one available to the jurors. The trial court's ruling was well within the bounds of reason. As in *Lopez*, "the jury was entitled to consider [Luna's] improper claim of privilege against [her] as evidence relevant to demonstrate exactly what the gang expert had opined: *that gang members act as a unit to advance the cause of the gang and to protect their members*." (*Lopez, supra*, 71 Cal.App.4th at pp. 1555–1556.)

Nor do we perceive a reasonable likelihood of impermissible prejudice. Not only did the trial court specially instruct the jury that Luna's conduct was to be considered solely as support for the gang expert's opinion, but it also instructed more generally that evidence admitted for a limited purpose could be considered only for that purpose. Further, the jury was not to speculate as to why "a person other than defendant was or may have been involved in" the charged offenses was not being prosecuted, and the jury was not bound to accept an expert opinion, but "must consider the strengths and weaknesses of the reasons" supporting the opinion. " '[It is] the almost invariable assumption of the law that jurors follow their instructions.' [Citation.] '[We] presume that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to

understand, make sense of, and follow the instructions given them.' [Citation.]" (*United States v. Olano* (1993) 507 U.S. 725, 740 [123 L.Ed.2d 508, 113 S.Ct. 1770]; see *People v. Romo* (1975) 14 Cal.3d 189, 195 [121 Cal.Rptr. 111, 534 P.2d 1015].) In addition and contrary to defendant's assertion, the prosecution did not argue that Luna's silence should be considered as substantive evidence of guilt. To the extent one might possibly read such an improper insinuation into the prosecutor's statements, we note that the jury was instructed that the attorney's statements were not to be considered as evidence. Moreover, any misunderstanding on that score could have been easily remedied by a timely objection and request for a curative instruction.

■ Defendant's attempt to frame the issue in terms of a violation of defendant's right to confront adverse witnesses under the Sixth Amendment fares no better. The United States Supreme Court has made it clear that a defendant's confrontation rights apply to testimonial statements offered for their truth. (*Tennessee v. Street* (1985) 471 U.S. 409, 413–414 [85 L.Ed.2d 425, 105 S.Ct. 2078]; *Crawford, supra,* 541 U.S. at p. 59, fn. 9 ["The [Confrontation] Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted. [Citation.]"].) The high court recently reiterated its long-standing teaching: "The [Sixth] Amendment contemplates that a witness who makes testimonial statements admitted against a defendant will ordinarily be present at trial for cross-examination, and that if the witness is unavailable, his prior testimony will be introduced only if the defendant had a prior opportunity to cross-examine him." (*Giles v. California* (2008) 554 U.S. __, __ [171 L.Ed.2d 488, 128 S.Ct. 2678, 2682].) Here, of course, Luna never testified as a witness and never offered any statement, much less a testimonial statement.

■ As our appellate courts have repeatedly found consistent with the Supreme Court's Sixth Amendment precedent: "Hearsay in support of expert opinion is simply not the sort of testimonial hearsay the use of which *Crawford* condemned." (*People v. Ramirez* (2007) 153 Cal.App.4th 1422, 1427 [64 Cal.Rptr.3d 96], citing *People v. Thomas* (2005) 130 Cal.App.4th 1202, 1210 [30 Cal.Rptr.3d 582].) "The rule is long established in California that experts may testify as to their opinions on relevant matters and, if questioned, may relate the information and sources on which they relied in forming those opinions. Such sources may include hearsay. (See *People v. Gardeley* (1996) 14 Cal.4th 605, 618–619 [59 Cal.Rptr.2d 356, 927 P.2d 713]; Evid. Code, § 801, subd. (b) [an expert's opinion may be based on matter 'whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates'].)" (*People v. Thomas, supra,* at pp. 1209–1210.) As our

colleagues in the Fourth District explain, admission of expert testimony based on hearsay will typically not offend confrontation clause protections because "an expert is subject to cross-examination about his or her opinions and additionally, the materials on which the expert bases his or her opinion are not elicited for the truth of their contents; they are examined to assess the weight of the expert's opinion." (*People v. Thomas*, at p. 1210.)

Defendant also argues the trial court's ruling violated Evidence Code section 710 and his right to due process under the state and federal Constitutions because convictions cannot be based on unsworn testimony. Under California law, it is generally the case that "[e]very witness before testifying shall take an oath or make an affirmation or declaration in the form provided by law . . . ." (Evid. Code, § 710.) However, there was no statutory error or due process violation because, as the trial court carefully instructed, Luna was not a witness and did not testify.

Finally, by failing to interpose a timely and specific objection based on Evidence Code section 352, defendant forfeited his contention that the trial court abused its discretion under that provision in permitting Luna to be called as a witness in the jury's presence. (See, e.g., *People v. Barnett* (1998) 17 Cal.4th 1044, 1130 [74 Cal.Rptr.2d 121, 954 P.2d 384].) In any event, were the issue properly before us, it would fail on the merits. Luna's appearance was admitted for a single, narrow purpose—to support the gang expert's opinion that the Mexican Mafia typically engaged in efforts of witness intimidation. Her refusal to be sworn as a witness was highly probative in that regard and there is no basis in the record to find the jury considered it for any other purpose.

In sum, there was no state law evidentiary error or constitutional violation arising out of Luna's refusal. In addition, any error would have been harmless whether assessed in terms of *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243], which asks whether it is reasonably probable defendant would have achieved a more favorable result if the court had ruled for the defense, or the harmless-beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824], applicable to constitutional claims of error.

II.–VI.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 142.

## DISPOSITION

The judgment is corrected to delete reference to the $5,030 state construction penalty. The clerk of the superior court is to forward a copy of the amended abstract of judgment and minute order to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

Armstrong, Acting P. J., and Mosk, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 9, 2009, S174281.