Filed 9/30/22 P. v. Sullivan CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C089679 |
| Plaintiff and Respondent, | (Super. Ct. No. 18FE000912) |
| v. | |
| DWAYNE ANTHONY SULLIVAN, | |
| Defendant and Appellant. | |

A jury found defendant Dwayne Anthony Sullivan guilty of first degree murder and being a felon in possession of a firearm. The jury further found true: defendant personally used a firearm during the commission of the murder; defendant personally and intentionally discharged a firearm during the murder; defendant personally and intentionally discharged a firearm which caused death to a person; and defendant had previously been convicted of negligent discharge of a firearm, a prior strike. The trial

1

court denied defendant's *Romero*[1] motion and sentenced defendant to 84 years to life, comprising of a determinate term of nine years consecutive to an indeterminate term of 75 years to life. Defendant timely appeals.

Defendant filed three opening briefs. He challenges his convictions on two grounds. First, defendant argues the trial court denied him a fair trial and violated his due process rights when the court exposed the jury to defendant's juvenile companion in crime, who was brought before the jury while in custody and refused to be sworn as a witness. Second, defendant asserts the trial court erred in refusing to grant a mistrial after a police sergeant described his official duties as gang related. We find no merit in these contentions and affirm the judgment of conviction.

Defendant further raises a myriad of challenges to his sentence. We find merit in one argument, concluding the trial court imposed an unauthorized sentence when it imposed a five-year Penal Code[2] section 667, subdivision (a) enhancement on the felon in possession of a firearm count. We thus vacate the sentence and remand for resentencing. Because we remand for resentencing, we do not address the remainder of defendant's sentencing arguments.

## FACTUAL AND PROCEDURAL BACKGROUND

We briefly set forth the facts necessary to provide context for this appeal. The specific facts pertinent to defendant's various arguments are set forth in greater detail as necessary in the Discussion *post*.

The victim was shot while paying for a haircut at a barber shop. He died nineteen days later from his injuries.

---

[1] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

[2] Further undesignated section references are to the Penal Code.

2

The barber shop owner testified the shooter came through the front door, wore a "dark color hoodie" "tightlike around his face," was built like a male, and had yellow, shiny, or gold teeth. A barber shop employee testified the shooter appeared to be a young African American man with a hoodie tight around his face and came through the front door.

Video surveillance from the smoke shop next to the barber shop showed defendant and D. C. drove into the parking lot around 9:30 a.m. Defendant wore a black hooded sweatshirt with the hood up and drawn around his face, blue faded pants, and distinctive tennis shoes. Defendant had black gloves hanging from his back pocket and had "some kind of gleam" on his teeth.

Defendant and D. C. entered the smoke shop, looked around, and appeared to make a purchase. They left the smoke shop around 9:37 a.m. At 10:18 a.m., the victim drove into the parking lot and entered the barber shop. Within seconds, defendant drove his car through the parking lot, paused outside the barber shop, and then left the parking lot onto the street. Defendant returned to the parking lot a few minutes later, parked in front of the smoke shop, and got out of the car. This time, defendant wore black gloves.

D. C. climbed into the driver's seat. A few seconds later, defendant ran from the barber shop and jumped into the passenger seat of the car. The car sped out of the parking lot. Defendant's photo following his arrest showed he had gold teeth or wore "a gold grill."

## DISCUSSION

### I

*The Trial Court Did Not Err In Having Defendant's Juvenile Companion Take The Stand*

#### A

*Additional Factual Background*

Before trial, the trial court granted the prosecutor's request to produce D. C., who was in juvenile custody, as a witness at trial. The court explained D. C. had "apparently

3

admitted to being a ward based on [a] second-degree murder conviction" and the conviction was not yet final. The prosecutor confirmed, that to compel D. C.'s testimony, she would be prepared to offer D. C. use immunity if he asserted his Fifth Amendment privilege on the stand.

The trial court continued: "And, therefore, you believe that he can be ordered to testify. Obviously, the problem is normally the hammer that you have to try to coerce somebody to testify is incarceration. He is incarcerated so the Court would be limited to really effectively adding fines to that. And we really don't know what the situation will be so we'll have to have a hearing outside the presence of the jury to size that up. [¶] The one thing that [the prosecutor] did argue is that even if the minor did refuse to testify, she believes that should be able to occur before the jury and invite the jury to take away an adverse inference from that. [¶] And, [defense counsel], I don't know if you've had the opportunity to fully research that. I just quickly read the *Lopez* case. I don't know what your position is on that. We don't have to resolve that right now."[3] (Italics added.)

Defense counsel responded *Lopez* is distinguishable and, if D. C. refused to testify, "that should not be done in front of the jury" or, alternatively, "his adjudication as a juvenile should not come in in front of this jury, and the jury should not [be] allowed to know about his conviction or juvenile adjudication. [¶] Because it is the same case, there is a danger and great prejudice to [defendant] that they would conclude that because one chose to make and be adjudicated as a juvenile and to a murder, that [defendant] must, therefore, also be guilty."

The trial court asked the prosecutor: "Putting aside the witness issue for a minute, was it your intent to try to get before the jury that a second suspect has been convicted, essentially?" The prosecutor said she did not intend to do so unless D. C. testified. The

---

[3]     The trial court was presumably referring to *People v. Lopez* (1999) 71 Cal.App.4th 1550 (*Lopez*), discussed *post*.

4

trial court asked to "play this out." "Let's say he refused to testify, would—if he refuses to testify, you obviously can't impeach him. So in that case would you try to argue to the jury that he entered a plea?" The prosecutor said she would "need to give that some thought," to which the trial court responded: "Let's give a lot of thought to all of this because I think we're getting into different areas because the jury is not to speculate, and that is the problem I have with this potential scenario going all the way out, as you have laid out here."

During the trial, after the jury was excused, the trial court discussed D. C.'s proposed testimony. The judge explained: "The minor was essentially handled in juvenile court. There was initially a petition to certify him to adult court, and that was withdrawn. My understanding is that wasn't done as part of any plea agreement with the understanding the minor would testify, although there were ongoing discussions along that line." The trial court stated, "the district attorney indicated, well, without any reference to any commitment by the minor to testify, we were going to withdraw our petition to certify him to adult court and just proceed accordingly. So he entered a plea in juvenile court without any promises in connection with his testimony.

"My understanding the parties also agreed that he retains his [Fifth] [A]mendment right to be free from self-incrimination because the time for any appeal of that plea has not yet run. That won't run for a number of weeks, correct?" The prosecutor responded in the affirmative. The prosecutor further confirmed she was willing to grant D. C. use immunity. D. C.'s attorney agreed the trial court's summary of the facts was accurate and that D. C. knew why he was at the courthouse.

The trial court asked whether anyone wanted "to put anything on the record preliminary to having the witness brought here and us going through any immunity kind of issues that we need to go through?" Defense counsel said he did not and his "issues are what comes after and where do we go from there." The trial judge responded, "Well, I think we have to just play it out because if a witness doesn't have a privilege not to

5

testify, I think any proponent of that witness's testimony has a right to call them [*sic*] and at least attempt because, obviously, even if somebody says outside the presence of the jury, I'm not going to testify, we all know you never know until you start asking questions. So we'll just play it by ear on that."

Defense counsel responded: "I do understand that, and I understand the Court's position is that if after he's given testimony—well, the Court intends to advise him that he's going to be called to testify in front of the jury. I think the safer way to do it is to find out through questioning, maybe directly on the subject, what he plans on doing. Rather than taking by surprise and then take a break, depending on what happens in front of the jury. The—I think the—[prosecutor's] argument is going to be that she should be allowed to comment on his refusal, if indeed he does refuse."

The trial judge replied: "We're not there yet. The other reason I think it would be appropriate to call him as a witness in this case is just as almost an exhibit, really, because one of the issues is identification. And there is a video of people in the smoke shop. And so I think she would be entitled to just bring him before the jury just for that reason, and so we kind of accomplish that as well. So I think simply having the jury see him and asking some preliminary questions, I think, is appropriate to do.

"I've already advised [the prosecutor] not to get into any questioning, certainly initially, about his admission in juvenile court. I think that would be inappropriate initially. So I would anticipate we would start with just sort of background questions, that sort of thing, engage the willingness of the witness to testify.

"So I think we're all okay on that. And then we'll have to decide where to go from there."

After a recess, the trial court explained: "We're outside the presence of the jury. The witness, [D. C.], is seated in the witness stand. Standing or sitting next to him— well, standing right now, but he will be seated, is . . . his attorney. And there's also an

6

investigator from the [District Attorney's] Office that is going to be standing there as well. The defendant and all counsel are here."

The trial court addressed D. C. and asked whether he understood he was subpoenaed to testify. D. C. responded in the affirmative. The trial court explained to D. C. that he had a Fifth Amendment right not to testify because his time for appeal had not yet expired. D. C. confirmed that was his understanding and he would assert the right when asked questions.

The trial court next explained to D. C. that it was granting the prosecutor's request for use immunity and D. C. thus no longer had any privilege to refuse to answer any questions. As such, if D. C. failed to respond to questions the trial court ordered him to answer, he could be held in contempt and jailed or fined. D. C. responded he understood.

Defense counsel requested to ask D. C. questions to "find out what he's going to testify about." The trial court denied the request and defense counsel objected.

After the jury returned to the courtroom, the prosecution called D. C. to the stand. When the trial court clerk asked D. C. to raise his right hand, D. C. responded, "[n]o, thank you, sir." The trial court asked D. C. whether he was refusing to testify; D. C. responded he was. The trial court asked D. C. whether he understood he had no privilege not to testify and no legal basis for refusing to testify; D. C. responded he understood. The trial court then asked D. C. whether, if ordered to testify, he would refuse to testify "[n]o matter what question is asked?" D. C. answered in the affirmative.

The trial court excused the jury for the day. Following discussions between the court and counsel as to whether D. C. should be held in contempt, and after D. C. left the room, the trial court told counsel "both sides can propose instructions that they believe are appropriate" given D. C.'s refusal to testify. The judge explained, "one of the reasons I thought it was fair to do this in front of a jury, because even if he had told us that's what he was going to do, I think the jury has the right to see that person; if for no other reason, just for identity, right? [¶] So I would just ask both sides to submit appropriate

7

instructions that they think might advise the jury how to consider what they saw, if at all."

The following day, defense counsel requested to discuss D. C.'s refusal to testify. Defense counsel asked the trial court to "instruct the jury that they are not to consider his lack of testimony for any purpose in this case, essentially, words to that effect, that they are not to consider their observation of [D. C.'s] refusing to testify for any reason." The prosecutor disagreed, arguing the jury should be able to draw a negative inference from D. C.'s refusal to testify. The trial court explained, "any kind of negative inference would be unduly prejudicial" and would require the jury to speculate regarding the reason D. C. refused to testify.

After the jury returned to the courtroom, the trial court instructed the jury: "As you noted [D. C.] refused to even take the oath and refused to testify. You're not to speculate anything about that. He didn't give testimony so you have nothing, really, from him, and you are not to speculate why he may have refused."

B

*Defendant Was Not Denied A Fair Trial*

*And His Due Process Rights Were Not Violated*

Defendant argues D. C.'s testimony "was wholly irrelevant to any issue upon which a party bore a burden of proof at trial" and, thus, allowing D. C. to take the stand and refuse to testify "denied [defendant] his right to a fair trial and violated due process." Defendant further argues the trial court's admonition did not cure the resulting prejudice because "[i]t was unreasonable to expect the jury to be able to completely disregard the specter of seeing [D. C.] riding in a car with [defendant] near the time of the shooting, and then seeing [D. C.] in jail clothing, refusing to be sworn as a witness, highlighted by the fact [D. C.] had no legal basis to refuse to testify." In defendant's view, "the jury would have logically concluded [D. C.'s] refusal was for the purpose of protecting [defendant], a de facto suppression of incriminating evidence." Defendant asserts that

8

"[b]ecause this case presented a genuine issue of identity, a more favorable outcome is reasonably probable and reversal is required."

The People argue the trial court properly conducted the inquiry of D. C. before the jury and "[t]he only thing the trial court could or should have done differently is permit the prosecutor to argue and the jury to make a negative inference from D. C.'s refusal to testify." We conclude no error occurred.

First, we have found nothing in the record indicating defendant objected to D. C.'s potential testimony on relevance grounds, and defendant provides no citation to the record in that regard. Second, the trial court's decision to have D. C. take the stand violated none of defendant's rights.

"No person other than a defendant has a right to refuse to be sworn as a witness." (*Lopez, supra*, 71 Cal.App.4th at p. 1555.) Witnesses may, however, claim a valid constitutional or statutory right not to testify. Once the trial court becomes aware a witness intends to claim a Fifth Amendment privilege on the stand, the court must test the validity of the claim of privilege outside the presence of the jury. (*Lopez*, at p. 1555.) "If the court finds a valid privilege exists, it can either limit the questions the parties may ask before the jury or excuse the witness, if it becomes clear that any testimony would implicate the privilege." (*Ibid*.) It is improper to require a witness to assert a validly claimed privilege against self-incrimination in the presence of the jury because it allows the jury to draw "a speculative, factually unfounded inference." (*People v. Mincey* (1992) 2 Cal.4th 408, 442.)

In contrast, where, as here, the trial court determines a witness does not have a valid privilege, the witness's refusal to testify may be presented to the jury. (*Lopez, supra*, 71 Cal.App.4th at pp. 1554-1555; accord *People v. Morgain* (2009) 177 Cal.App.4th 454, 467; *People v. Sisneros* (2009) 174 Cal.App.4th 142, 151.) That is because " '[a] witness may not employ the privilege to avoid giving testimony that he [, she, or they] simply would prefer not to give.' " (*Lopez*, at p. 1556.) A witness does not

have a valid Fifth Amendment privilege when the prosecutor grants him, her, or they immunity. (*People v. Morgain*, *supra*, 177 Cal.App.4th at p. 467.)

Defendant attempts to distinguish his case from *Lopez*, *Morgain*, and *Sisneros* based on factual dissimilarities related to the import and relevance of the testimony anticipated by the witnesses who refused to testify in those cases. We find the factual distinctions irrelevant because the questions of whether defendant received a fair trial or whether his due process rights were violated rest on whether the trial court erred in allowing D. C. to be called to the stand and refuse to testify. In that regard, *Lopez*, *Morgain*, and *Sisneros* are instructive. D. C. did not have a valid privilege to assert and thus his refusal to testify was properly presented to the jury. Defendant's citations to general authorities regarding denials of due process and fair trials, without any reasoning associated with the application of those authorities, do not lead to a contrary conclusion.

*Cummings* does not assist defendant either. (Citing *People v. Cummings* (1993) 4 Cal.4th 1233.) In that case, the jury found the defendant and codefendant guilty of first degree murder and found true several special circumstances. (*Id.* at p. 1255.) In the portion of the opinion upon which defendant relies, the codefendant argued the trial court erred in admitting evidence his wife had been tried and convicted of being an accessory after the murder. (*Id.* at pp. 1271, 1294.) He argued the evidence was irrelevant on any issue and, if introduced as evidence of his guilt, it constituted inadmissible hearsay. (*Id.* at p. 1294.) Our Supreme Court agreed the evidence was irrelevant and explained the wife's conviction "reflected only the view of a judge or jury that evidence presented in a different case established that [the wife] had assisted the defendants or either of them after the murder." (*Id.* at p. 1295.) We fail to see how *Cummings* has any pertinence to the issue raised in this appeal -- i.e., whether the trial court erred in having D. C. take the stand.

We note that, where a witness has no constitutional or statutory right to refuse to testify, jurors are entitled to draw a negative inference when such a witness refuses to

10

provide relevant testimony. (*Lopez, supra*, 71 Cal.App.4th at p. 1554; *People v. Morgain*, *supra*, 177 Cal.App.4th at p. 468; *People v. Sisneros, supra*, 174 Cal.App.4th at pp. 151-153.) Here, however, the trial court instructed the jury not to speculate as to why D. C. refused to testify. Defendant was thus in a better position than the defendants in *Lopez*, *Morgain*, and *Sisneros*, and we find no basis for reversing the trial court's decision to have D. C. take the stand and refuse to testify.

II

*The Trial Court Did Not Err In Denying Defendant's Mistrial Motion*

Defendant argues the trial court erred in denying his request for a mistrial because a police sergeant's gang references "were too prejudicial to be cured by an admonition, and resulted in an unfair trial that denied [d]ue [p]rocess." We disagree.

A

*Additional Factual Background*

During motions in limine, the trial court considered the defense's motion "to exclude mention of defendant being a member or associated with a street gang." The trial court asked the prosecution whether it intended to "provide any evidence that the defendant has any affiliation with a street gang?" The prosecution responded it did not have a plan to do so. The trial court granted the motion in limine "to exclude any reference to gang membership or association on the part of the defendant."

Before Sacramento Police Sergeant John Montoya took the stand, defendant noted the police reports indicated Sergeant Montoya was working in the department's major crimes gang investigation unit. Defendant asked that Sergeant Montoya be introduced as a major crimes detective, "just not anything to do with gangs for the motions in limine." The prosecutor responded: "I had indicated to [defense counsel] that I would be asking certainly what their role was, but when they talk about duties and responsibilities to not focus in on gangs. The reality is they were gang detectives at the time. I'm not going to belabor that in any way. I can attempt to lead them and say, have you been a detective

11

dealing with gangs, as well as other major violent crimes, to try to make it more vague. But the reality, it is what it is. That's what [*sic*] the unit they were all assigned to at the time this occurred."

The trial court asked: "But there's no evidence of any gang relationship in this particular case, right?" The prosecutor confirmed that to be true. The court then asked: "Well, then don't you think it might be a little prejudicial to suggest they were investigating the defendant because of his gang involvement if, in fact, there is no gang involvement related in this case?" The prosecutor explained she had "been very specific with them that they are not to mention that they were investigating him for gang purposes." The trial court replied: "Well, then I guess what would be the harm of just saying you work in a unit that specializes in major crimes, right? Would that be okay?" The prosecutor responded, "[t]hat's fine." The trial court followed up: "Now, if some incidental references to gang comes up, I don't have a problem with that. I mean, we can't sanitize everything. But I think, initially, if you can advise your officer that you're just going to refer to his unit as major crimes and take out the gang, I think he'll understand that. So I'll give you a minute to talk to him."

During Sergeant Montoya's testimony, he made four statements referencing "gang."

First, when Sergeant Montoya was asked what happened after he arrived at the barber shop, he responded: "[W]e were briefed by not only our gang sergeant, our detective sergeant, but by the district sergeant, essentially laying out what they knew at the time." Defense counsel objected on narrative grounds and asked to approach the bench. The trial court responded, "[y]ou don't have to approach. [¶] Just wait for the next question."

Second, when asked why the barber shop owner would not agree to a more formal interview, Sergeant Montoya testified: "So he was actually very afraid. He was extremely cautious just to talk to me again. Unfortunately, at the time my task vest

12

indicated I was a gang detective, and so I think he was nervous that people were going to see that he was talking to me again, as opposed to just from the initial conversation to uniformed police officers." Defense counsel objected "based on in limine motions" and the trial court sustained the objection. Defense counsel then asked for a sidebar, and a bench conference was held. The bench conference was not transcribed by the court reporter.

Third, during cross-examination, defense counsel asked why no "live lineup" was done. Defense counsel asked, "because at that point you believe[d] that you had enough, correct?" Sergeant Montoya testified: "No. I believe I didn't want to put anyone else in jeopardy of having to be identified, then come to court to testify. In my line of work as a gang detective, a senior gang detective, I've dealt with numerous witnesses who are extremely afraid to sit in the stand." Defense counsel responded: "We're not talking about any of that, and I appreciate you volunteering that. However, we're talking about this case that has absolutely nothing [to do] with that opinion."

Finally, during cross-examination, defense counsel asked Sergeant Montoya whether he would have learned of a positive gunshot residue test on the defendant's shoes, if such a test had come back positive. Sergeant Montoya replied: "Except for I got promoted a couple months later, and I was out of the loop because it became a homicide. When it became a homicide, the gang unit was no longer involved." Defense counsel asked to take a break "and address certain things with the Court." A bench conference was held. The bench conference was not transcribed by the court reporter.

The trial court then addressed Sergeant Montoya and said: "[W]e're going to give you a two-minute break to collect your thoughts for a minute. Take a deep breath. I'm going to try to get you done today because I know you haven't had much sleep."

At the end of the day, defense counsel addressed the trial court: "In regards to Sergeant Montoya, I have brought to the Court's attention. I tried as much as possible not to make it obvious, but at some point he couldn't be—when the detective kept

13

volunteering the gang issue in regards to his position, that he was with a gang unit, that his vest said gang, that he no longer was with the gang unit, that he was the senior gang detective; that—those were all gratuitous statements that he was advised about. He still talked about them, and I think it prejudiced this jury now thinking that because we had not just the gang unit, but the senior gang detective on the gang unit in charge of this case. He's the main investigating officer in this case. He was—I think the prejudice really cannot—I don't see how we can overcome that." The trial court asked whether defendant was "making a motion for a mistrial." Defense counsel responded, "[e]ssentially in order to preserve the record, I think I have to."

The trial court ruled: "I'm going to deny the motion for mistrial. I did think there were a couple of references that probably could have been avoided. On the other hand, he was in the gang unit, and it's difficult when a witness is living [*sic*] something to say, oh, you're coming into court now; pretend you had nothing to [do] with gangs.

"But the real import of his testimony, I think, which was I think very legitimate, is he had the opinion these people were scared. And so whether this is a gang-related incident or not, and the jury is not going to hear an[y] evidence that it's gang related, you know, the fear of witnesses, you know, they may believe it's gang related; and they may believe if somebody comes in and shoots up a place, that they'll come back to shoot them up, if they're witnesses.

"So I think we minimized that. I did take a break and asked [the prosecutor] to kind of re-advise the witness not to volunteer any mention of gangs. And once we came back and did that, he didn't. And I also asked her to kind of lead a little bit just to avoid that issue. But I think all in all, I don't think there was anything prejudicial.

"Again, if you want me to fashion some sort of cautionary instruction, I know it is difficult because you don't want to highlight the issue, but I just don't think there was any prejudicial comments made there. So that's why I'm denying the motion. But if you want me to come up with some cautionary instruction, I'm happy to consider it."

14

When asked whether there was anything else to discuss, defense counsel said, "[n]o, thank you."

## B

### *The Trial Court Did Not Abuse Its Discretion*

" 'Denial of a motion for a mistrial is reviewed for abuse of discretion and should be granted "only when ' "a party's chances of receiving a fair trial have been irreparably damaged." ' " ' [Citation.] ' " 'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' " ' " (*People v. Tatum* (2016) 4 Cal.App.5th 1125, 1130.) That is because the trial court is in a better position to judge in the first instance the level of prejudice resulting from the evidence being revealed to the jury. We will not substitute our judgment for that of the trial judge, who witnessed the testimony and the jury's reaction.

Juries often hear unsolicited and inadmissible comments. "A witness's volunteered statement can, under some circumstances, provide the basis for a finding of incurable prejudice." (*People v. Ledesma* (2006) 39 Cal.4th 641, 683.) "In cases *not* involving [a] gang enhancement, [our Supreme Court has] held that evidence of gang membership is potentially prejudicial and should not be admitted if its probative value is minimal." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.)

Defendant asserts "[t]he erroneous admission of gang evidence has resulted in numerous reversals," citing five cases. None of those cases involved facts analogous to this case. (*People v. Cardenas* (1982) 31 Cal.3d 897, 906 [trial court's error admitting evidence of common gang membership compounded by prosecutor's broad inquiries suggesting the gang was involved in criminal activities "made it a near certainty that the jury viewed [the defendant] as more likely to have committed the violent offenses charged against him because of his membership in the Flores gang"]; *People v. Ramirez*

15

(2016) 244 Cal.App.4th 800, 821-822 [judgment reversed after gang expert testified at length regarding gangs and that the defendant was a gang member but none of the gang evidence was relevant to the attempted murder and assault charges]; *People v. Memory* (2010) 182 Cal.App.4th 835, 859 [trial court erred in admitting gang evidence to show the defendants had a criminal disposition to fight with deadly force when confronted]; *People v. Albarran* (2007) 149 Cal.App.4th 214, 227-228 [trial court erred in allowing the prosecution to present a panoply of incriminating gang evidence with no connection to or bearing on the underlying charges]; *People v. Ozuna* (1963) 213 Cal.App.2d 338, 340-342 [trial court's admonition did not remove obvious prejudice to defense after police officer's testimony regarding the defendant's statement he was an exconvict].)

We find no abuse of discretion on this record. Sergeant Montoya's references to "gang" were in the context of his job duties and he did not indicate the investigation or shooting was related to any gang, or that either defendant or the victim was a member of or associated with any gang. That the gang unit may have originally been involved in investigating the crime does not lead to the conclusion the crime was related to a gang. Indeed, the jury heard no other evidence regarding any gang affiliation or membership during the trial. Further, while the trial court offered to give the jury a cautionary or curative instruction, defendant did not request one, presumably for the tactical reason to avoid highlighting the references.

While it is undisputed that the trial court intended to exclude gang evidence because it was irrelevant to the charges in this case, we nevertheless conclude the four gang statements were not so egregious that they infected the entire trial and rendered defendant's trial fundamentally unfair. (*People v. Merriman* (2014) 60 Cal.4th 1, 70 [erroneous admission of evidence may violate due process "if the error rendered the defendant's trial fundamentally unfair"].)

16

*The Five-Year Enhancement Is An Unauthorized Sentence And Remand Is Appropriate*

The trial court sentenced defendant to determinate and indeterminate terms. The trial court imposed an indeterminate term of 75 years to life, comprised of 25 years to life for the first degree murder, doubled to 50 years to life, plus 25 years for the firearm enhancement. The trial court imposed a consecutive determinate term of nine years, comprised of the midterm of two years, doubled to four years, on the felon in possession of a firearm count plus five years for the prior strike conviction under section 667, subdivision (a).

In his supplemental opening brief, defendant argues the determinate sentence abstract of judgment should be corrected to delete the five-year enhancement imposed under section 667, subdivision (a)(1) because it was imposed on the felon in possession of a firearm count, which is not a serious felony. The People agree a felon in possession of a firearm conviction does not constitute a serious felony under section 1192.7, subdivision (c), but argue the first degree murder count is a serious felony and the enhancement should apply to that count. The People contend, that because the error amounts to a clerical error, we may strike the five-year enhancement on the determinate abstract of judgment and correct the indeterminate abstract of judgment to reflect the enhancement was imposed on the murder count.

In his second supplemental opening brief, defendant argues the error amounted to a judicial error, not a clerical error and, if this court concludes it cannot simply strike the five-year enhancement, we should remand the matter for resentencing.

It is true we have jurisdiction to order correction of clerical errors, such as abstracts of judgment that do not accurately reflect the oral pronouncement of judgments of sentencing courts. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.) The error in this case is not, however, a clerical error. The People argue the record reflects "the trial court ordered the imposition of the five-year sentence enhancement to apply to [the first degree

murder count]" and we may thus correct the abstracts of judgment. Not so. The trial court imposed the five-year enhancement as part of the determinate sentence, not the indeterminate sentence. The felon in possession of a firearm count was the only conviction subject to a determinate sentence. The enhancement thus constitutes an unauthorized sentence because the felon in possession of a firearm count is not a serious felony within the meaning of subdivision (c) of section 1192.7. (§ 667, subd. (a)(1), (4).) We thus vacate the sentence and remand the matter for resentencing to allow the trial court to reconsider its discretionary sentencing choices.

" 'When a case is remanded for resentencing by an appellate court, the trial court is entitled to consider the entire sentencing scheme. Not limited to merely striking illegal portions, the trial court may reconsider all sentencing choices. [Citations.] This rule is justified because an aggregate prison term is not a series of separate independent terms, but one term made up of interdependent components.' " (*People v. Burbine* (2003) 106 Cal.App.4th 1250, 1258; see also *People v. Buycks* (2018) 5 Cal.5th 857, 893 ["when part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances' "].)

Because the matter is remanded for resentencing, we do not address defendant's arguments: (1) the trial court erred in failing to calculate and apply defendant's actual time in custody; (2) the record does not support the trial court's refusal to apply section 654 to the felon in possession of a firearm count; (3) the trial court erred in failing to recognize defendant's youth as a basis for striking his strike; (4) defendant should be given an opportunity to demonstrate his inability to pay the $10,000 restitution fine in addition to the $7,500 direct restitution; (5) the trial court misunderstood the scope of its discretion to strike the five-year enhancement under section 1385, subdivision (a); and (6) based on legislative changes to section 1385, effective January 1, 2022, a different sentence on remand is more than a reasonable probability.

## DISPOSITION

The judgment of conviction is affirmed. The sentence is vacated, and the matter is remanded to the trial court for resentencing.

/s/_____,
Robie, Acting P. J.

We concur:

/s/_____,
Renner, J.

/s/_____,
Earl, J.